[No. S161044. Apr. 9, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY DEAN STORY, Defendant and Appellant.

## COUNSEL

J. Frank McCabe, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman, Laurence K. Sullivan and Jeffrey M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—When a defendant is accused of a "sexual offense," Evidence Code section 1108[1] gives the trial court discretion to admit evidence of other sexual offenses the defendant committed. As relevant here, the statute defines sexual offense as a crime or attempted crime that "involve[s]" "[a]ny conduct proscribed by" various other penal provisions, including Penal Code section 261, which defines the crime of rape. (§ 1108, subd. (d)(1).) We granted review primarily to decide whether a defendant tried for first degree felony murder, with rape the underlying felony, is accused of a sexual offense under this definition.

Because a murder during the course of a rape involves conduct, or at least an attempt to engage in conduct, proscribed by Penal Code section 261, we conclude that a defendant accused of such a murder is accused of a sexual offense within the meaning of section 1108. Accordingly, we reverse the judgment of the Court of Appeal, which had found the trial court prejudicially erred in admitting evidence of other sexual offenses.

The Court of Appeal also concluded insufficient evidence supported the jury's finding that defendant murdered the victim while raping her. We conclude the Court of Appeal erred in this respect also. Ample evidence supports the jury's verdict of first degree felony murder.

## I. FACTS AND PROCEDURAL HISTORY

### A. Evidence Presented at Trial

On October 22, 1976, 26-year-old Betty Yvonne Vickers was found dead, lying on her stomach on the right side of the bed in the bedroom of her apartment on Dana Street in Mountain View. She was wearing only a football jersey; the bottom half of her body was covered with bed covers. Panties were under the pillow on the bed and a bloody tampon was on the bed beside her body. A large semen stain was found on the bottom sheet. The rest of the apartment contained no evidence of a struggle.

An autopsy revealed that Vickers had been strangled to death. Her body had many abrasions and other injuries, some caused by the victim's struggling while she was being strangled. The pathologist testified that the injuries were most consistent with the victim's "being face up and someone applying their hands to her neck and either their elbows on to the collar bones or the chest or perhaps even their knees to straddle her and immobilize her." The vagina

---

[1] All statutory references are to the Evidence Code unless otherwise indicated.

contained a white discharge but no sign of injuries. The pathologist testified that the absence of injury to the vagina did not rule out a sexual assault. There was no evidence of sperm, which is what would be expected if the assailant had had a vasectomy. (Defendant had had a vasectomy.) The victim was menstruating when she died. The pathologist estimated the time of death as shortly after the victim's friends last saw her alive, which was around 1:30 a.m. the morning her body was found.

Defendant and Vickers had been coworkers in Palo Alto. A friend who lived with Vickers in the summer of 1976, before Vickers moved into the Dana Street apartment, testified that defendant was once at her and Vickers's home. Another time, Vickers told the friend that defendant had spent the night at their home but, Vickers told the friend, " 'Nothing happened. I just let him sleep here but nothing happened. I'm on my period.' "

One Sunday morning in September 1976, around the time Vickers moved into the Dana Street apartment, a man later identified as defendant appeared at the sliding glass door of an apartment near Vickers's apartment. He told two women in the apartment that he was looking for Vickers. The women, who had not previously known defendant, told him they did not know her. Defendant became persistent and even hostile, making the women uneasy, before he finally left. That evening, when one of the women was alone in the apartment, defendant knocked on the door. He told the woman something like "Betty had stood him up." He had alcohol on his breath, which made the woman uncomfortable. Eventually defendant left.

Before her death, Vickers and some of her friends often socialized at the Saint James Infirmary, a Mountain View bar about two and a half miles from Vickers's Dana Street apartment. Defendant sometimes joined the group, although he was not a regular. Vickers introduced him to the others as a coworker. On the evening of October 21, 1976, the night of her death, Vickers had dinner with her sister in Pacifica, then went to the Saint James Infirmary, arriving sometime around 8:30 to 10:00 p.m. She sat with some of her friends, including Shirley Kovach and Patricia Courter. Kovach had driven Courter to the bar and expected to drive her home at the end of the evening.

During the course of the evening, defendant joined the group. At one point, defendant asked Courter if she wanted to have breakfast with him at Denny's. She said no, she was not interested. She felt defendant was trying to "hit on" her. Courter then observed defendant talk to Vickers and saw Vickers shake her head no. Courter could not hear what they were talking about, but she saw Vickers turn her back on defendant as if she did not want to talk with him anymore.

The group left the bar shortly after 1:00 a.m. that morning. As they were leaving, Vickers asked Kovach if she, Kovach, could go home with her. Kovach said she could not do so because she had to give Courter a ride home. Outside the bar, Courter observed defendant approach Vickers and say something in what appeared to be a whisper. Courter could not hear what it was, but she saw Vickers shake her head no. Vickers then got into her car and drove away alone in the direction of her apartment. Defendant also drove away in his car, going in the same direction. It was the last time her friends saw Vickers alive.

After Vickers's body was found, defendant told the police that he had been at the Saint James Infirmary the night she died and he left around 1:30 a.m. He said he went directly home without making any stops and arrived home no later than 2:00 a.m. His wife at the time testified that he was not home that night between the hours of 2:00 and 4:00 a.m. Later defendant told her that he had been "out driving around," but he did not say where. Defendant's first wife, who had been married to him from 1971 to 1973, testified that on the day of Vickers's funeral, defendant asked her to have lunch with him. At lunch, defendant told her that the police might ask her questions regarding his whereabouts. He asked her to give him a false alibi for the early morning hours of the night Vickers died. He also told her he had been at the Saint James Infirmary that night with a group of people, including Vickers. He said that after he left the bar, he drove around for a while. A couple of days later, defendant again asked his former wife to provide a false alibi. She told him she would not do so. Defendant never denied killing Vickers.

One of defendant's coworkers testified that defendant called her on the telephone and accused her of telling the police that he had admitted killing Vickers. She told him she had not done so, then also told him that he had never denied the killing. Defendant responded immediately, "just don't worry about it."

Two women who were married to defendant after Vickers's death testified that, on a number of occasions before they were married, defendant told them that he had killed before and had gotten away with it. He was serious. One of the former wives testified that she and defendant lived in Arizona at the time. In connection with his statement that he had killed before and gotten away with it, he told her "why do you think I had to leave California." He also said that he had been arrested in connection with the killing he had gotten away with, but he was then released because of insufficient evidence. In fact, defendant had been arrested for the Vickers killing and subsequently released for lack of evidence.

A criminalist examined the semen stain on the bedsheet using techniques available in 1976. He concluded that defendant could not be excluded as a

donor of the semen, but neither could most of the population. In 2001, when investigation into this case was reopened, and since then, the physical evidence, including the bedsheet, could not be located.

Over objection, the trial court admitted evidence of four other sexual assaults that defendant committed, two before and two after Vickers's death.

Maureen E. testified that she met defendant in August 1973. He was interested in dating her but she was not, although they did have one date. Around 8:00 p.m., February 13, 1974, defendant appeared unexpectedly at her apartment "reek[ing] of alcohol." He entered the apartment, then struck her on the head with a gun, rendering her unconscious. When she regained consciousness, defendant dragged her into the bedroom and ripped her clothes off. At some point, defendant left the bedroom. Maureen broke open a window and screamed, but defendant returned, grabbed her, threw her onto the bed on her back, pinned her down with his legs, and strangled her "into unconsciousness." When she regained consciousness again, defendant was gone.

Jayne H. testified that she met defendant on one occasion at her home in July 1975. She next met defendant in early 1976 at the Saint James Infirmary as part of a group that included Vickers. Defendant engaged Jayne in a conversation that made her uncomfortable, and she left the group. Later that evening, he knocked on the door of her home, asked her why she had left the bar without saying goodbye, and then entered the house uninvited. He began to kiss her and, despite her protests, forced her to have sexual intercourse against her will.

Andrea H. testified that in 1980 she met defendant in Arizona. The day after she met him, she went on a date with him. In his car, he tried to kiss her; when she asked him to stop, he choked her. As a result, she did not want to see him again. Less than a month later, on May 29, 1980, around 11:00 p.m., defendant entered her apartment uninvited. She told him to leave, but defendant pulled out a gun and raped her. Afterwards, defendant straddled her and began to strangle her. After a while defendant stopped and got dressed. She got her dress, fled to the bathroom, and climbed out the window to get help.

Peggi N. testified that in 1986, she lived in Phoenix, Arizona. She and defendant were coworkers. Defendant expressed a romantic interest in her even though she was married. She was not interested in him and, in fact, quit her job to avoid him. On June 15, 1986, in the middle of the night, when her husband was away at work, defendant appeared uninvited at her house. He then raped her at gunpoint and left.

Defendant did not testify at trial. He presented one witness—a serologist who testified that, in her opinion, approximately 88 percent of the population could have contributed the semen stain on the bedsheet.

### B. *Procedural History*

In 2002, defendant was indicted for Vickers's murder. The trial court denied defendant's motion to exclude evidence of his other sexual assaults, although it limited the nature and duration of the testimony. After the presentation of evidence, the trial court denied defendant's motion to dismiss the charges due to precharging delay. The jury found defendant guilty of Vickers's first degree murder, and the court sentenced him accordingly.

The Court of Appeal reversed the judgment. It held that the trial court prejudicially erred in admitting evidence of defendant's other sexual assaults, finding that he was not accused of a sexual offense within the meaning of section 1108, and that the trial court abused its discretion in admitting it under section 1101. It also found the evidence did not support a first degree murder verdict because there was insufficient evidence that defendant entered Vickers's apartment with the intent to rape or that he killed Vickers in the course of rape or attempted rape.

We granted the Attorney General's petition for review.

### II. DISCUSSION

### A. *Admission of Evidence of Defendant's Other Sexual Offenses*

■ Over objection, the trial court admitted the evidence of defendant's four other sexual assaults. In careful and thorough discussions, it found the evidence admissible under both section 1101[2] and section 1108. It also found the evidence not unduly prejudicial under section 352.[3] The Court of Appeal

---

[2] Subdivisions (a) and (b) of section 1101 provide: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

[3] Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate

concluded that section 1108 did not apply to this murder charge and further held that the trial court abused its discretion in admitting the evidence under section 1101. We conclude that section 1108 does apply here and the trial court properly admitted the evidence under that section.

Section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

Section 1108, subdivision (d)(1), defines "sexual offense": " 'Sexual offense' means a crime under the law of a state or of the United States that involved any of the following:

"(A) Any conduct proscribed by Section 243.4, 261, 261.5, 262, 264.1, 266c, 269, 286, 288, 288a, 288.2, 288.5, or 289, or subdivision (b), (c), or (d) of Section 311.2 or Section 311.3, 311.4, 311.10, 311.11, 314, or 647.6 of the Penal Code.

"(B) Any conduct proscribed by Section 220 of the Penal Code, except assault with intent to commit mayhem.

"(C) Contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person.

"(D) Contact, without consent, between the genitals or anus of the defendant and any part of another person's body.

"(E) Deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person.

"(F) An attempt or conspiracy to engage in conduct described in this paragraph."

The original indictment in this case, filed in April 2002, charged defendant with Vickers's murder. It specifically alleged that defendant "did with malice aforethought and during the perpetration and attempt to perpetrate rape and burglary, kill Betty Yvonne Vickers, a human being." Defendant was not also charged with Vickers's rape, no doubt because the limitations period on rape had expired by 2002. Later, an amended indictment—the one in operation at trial—simply alleged that defendant "did unlawfully and with malice aforethought, kill Betty Yvonne Vickers, a human being." The reference to rape

undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

and burglary was deleted. At trial, the prosecution sought and obtained a first degree murder verdict based on felony murder with rape and burglary the underlying felonies. (Pen. Code, § 189.) The burglary was based on defendant's entering Vickers's apartment with the intent to commit rape.

■     Section 1108's language makes clear that it "is limited to the defendant's *sex offenses*, and it applies only when he is charged with committing *another sex offense.*" (*People v. Falsetta* (1999) 21 Cal.4th 903, 916 [89 Cal.Rptr.2d 847, 986 P.2d 182].) Thus, the question before us is whether, under the circumstances of this case, defendant was "accused of a sexual offense" within the meaning of section 1108. The Court of Appeal held that he was not so accused because murder "is not found in any of the enumerated Penal Code sections nor does it include as a necessary element nonconsensual *sexual* contact." We disagree.

■     Penal Code section 189 defines various types of first degree murder, including any "murder which is . . . committed in the perpetration of, or attempt to perpetrate, . . . rape, [or] burglary . . . ." First degree felony murder with rape and burglary (based on entry with the intent to rape) was the only theory of first degree murder presented at trial. This type of first degree murder unquestionably involves conduct proscribed by Penal Code section 261, the statute defining rape, or at least an attempt to engage in that conduct. The amended indictment deleted any specific reference to rape and simply included an open charge of murder.     ■     But a pleading that contains an open charge of murder adequately notifies the defendant of the possibility of conviction of first degree murder on a felony-murder theory, including rape felony murder. (*People v. Geier* (2007) 41 Cal.4th 555, 591 [61 Cal.Rptr.3d 580, 161 P.3d 104].) Defendant was not only prosecuted for, he was convicted of, first degree murder on this felony-murder basis. Accordingly, he was accused of a sexual offense as defined by section 1108.

In concluding otherwise, the Court of Appeal relied heavily on the decision in *People v. Walker* (2006) 139 Cal.App.4th 782 [43 Cal.Rptr.3d 257] (*Walker*), another murder case where the trial court admitted evidence of other sexual offenses under section 1108. The *Walker* court summarized the issue before it as "whether section 1108, subdivision (d)(1)(E)'s inclusion in the definition of sexual offense of crimes that involve '[d]eriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person' authorizes use of evidence of other sexual offenses when the circumstances under which a violent crime has been committed suggest the defendant derived sexual pleasure or gratification from the victim's pain, even though sexual pleasure or gratification is neither a necessary element of the charged offense nor alleged in the information as an enhancement or aggravating factor." (*Walker, supra,* at p. 799.) The appellate

court interpreted section 1108 as requiring "that the requisite sexual transgression must be an element or component of the crime itself without regard to the evidence establishing a specific violation." (*Walker, supra*, at p. 800.) Under this standard, the court held that the trial court erred in admitting the evidence under section 1108. (*Walker, supra*, at p. 802.)

*Walker* is distinguishable because the defendant in *Walker*, although charged with first degree murder, was convicted of second degree murder, and the opinion gives no indication the prosecution sought a first degree murder conviction on a rape-felony-murder theory. It appears the only theory in that case that would have made the charged crime a sexual offense under section 1108 was that the evidence suggested the defendant had killed for sexual pleasure or gratification. *Walker* recognized that sometimes murder *can* qualify as a sexual offense under section 1108, for example, if rape-related special circumstances are alleged. (*Walker, supra*, 139 Cal.App.4th at p. 798.) (Here, no special circumstances were alleged, no doubt because the law in effect in 1976 providing for special circumstances had been declared unconstitutional. (*Rockwell v. Superior Court* (1976) 18 Cal.3d 420, 426 [134 Cal.Rptr. 650, 556 P.2d 1101].)) *Walker* did not involve, or discuss, the question whether an open murder charge prosecuted as first degree murder on a rape-felony-murder theory is a sexual offense under section 1108. Nevertheless, the Court of Appeal extended *Walker* to this case.

■ We need not and, accordingly, do not decide whether *Walker, supra*, 139 Cal.App.4th 782, correctly interpreted section 1108. Even under *Walker*, defendant was accused of a sexual offense. As we have explained, first degree felony murder with rape the underlying felony involves, as an element, conduct proscribed by Penal Code section 261, the statute defining rape, or at least an attempt to engage in that conduct. Accordingly, even assuming, without deciding, that *Walker* was correct in limiting the applicability of section 1108 to offenses in which sexual misconduct is an element or component of the crime itself, the Court of Appeal erred in extending its holding to this case.

■ The Court of Appeal tried to bolster its conclusion by invoking "a familiar maxim of statutory construction: *expressio unius est exclusio alterius*. That is, to specify one thing in a statute is to impliedly exclude other things not specified." It concluded that because section 1108, subdivision (d)(1)(E), specifies only killing for sexual pleasure or gratification and not other forms of sexual killing, such as killing during a rape, it impliedly excluded all other forms of sexual killing from its definition of a sexual offense. But this analysis simply assumes the conclusion—that other types of sexual killings are not included elsewhere. If other forms of sexual killing, such as killing while raping, are included in section 1108, subdivision (d)(1)(A), there would be no need to repeat those types of sexual killings

elsewhere. It seems most reasonable to conclude, as the Attorney General puts it, that section 1108, subdivision (d)(1)(E)'s "role is to capture a unique type of sexually motivated homicide not otherwise identified in other parts of the statute."

The Court of Appeal also concluded the legislative purpose behind section 1108 supports its restrictive interpretation. It quoted language from *People v. Soto* (1998) 64 Cal.App.4th 966, 983 [75 Cal.Rptr.2d 605], stating that in enacting section 1108, "the Legislature 'declared that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the witness.' " (Quoting *Review of Selected 1995 California Legislation* (1996) 27 Pacific L.J. 761, 762; see also *People v. Falsetta, supra*, 21 Cal.4th at p. 912.) Focusing on "determining the credibility" of witnesses and ignoring the reference to the "particularly probative" nature of this evidence, the Court of Appeal believed the legislative purpose does not apply here. It observed, "Here, there was no witness whose credibility needed to be determined." The observation is factually correct—because defendant killed Vickers, she could not testify—but it hardly supports the Court of Appeal's conclusion. The necessity for admitting this particularly probative evidence that exists when the alleged victim's credibility might be questioned can be no greater than the necessity that exists when the victim was *killed* and thus cannot even tell her story. To help determine what happened in Vickers's home the night defendant strangled her, it was particularly probative for the jury to learn of defendant's history of sexual assaults. Neither section 1108's language nor its purpose supports the conclusion the Legislature wanted to permit this evidence when the alleged sexual assault victim survives and can testify but not when the victim dies and cannot speak.

The conclusion that section 1108 applies here finds support in the holding of *People v. Pierce* (2002) 104 Cal.App.4th 893 [128 Cal.Rptr.2d 397]. In *Pierce*, the issue was whether assault with intent to commit rape under Penal Code section 220 was a sexual offense under section 1108. The defendant was tried before section 1108, subdivision (d)(1), was amended to add to the list of qualifying crimes assault with the intent to commit rape. (*People v. Pierce, supra*, at pp. 898–899.) The Court of Appeal held that assault with intent to commit rape was a qualifying sexual assault even before the amendment, noting that assault with intent to rape "involves" conduct proscribed by the offenses listed in section 1108, subdivision (d)(1)(A). (*People v. Pierce, supra*, at p. 898.) The court concluded its discussion of the issue by noting that "[u]nder Pierce's interpretation of the statute, if he had committed attempted rape, section 1108 would apply. But because he committed the more serious offense of assault with intent to commit rape, it does not. We are confident the Legislature did not intend such an absurd result."

(*Id.* at p. 899.) Similarly, we are confident the Legislature did not intend that section 1108 would apply when a sexual assault victim survives but not when the defendant kills the victim.

■ Defendant argues that the "rule of lenity" requires us to interpret section 1108 as not governing this situation. "[W]e have repeatedly stated that when a statute *defining a crime or punishment* is susceptible of two reasonable interpretations, the appellate court should ordinarily adopt that interpretation more favorable to the defendant." (*People v. Avery* (2002) 27 Cal.4th 49, 57 [115 Cal.Rptr.2d 403, 38 P.3d 1], italics added.) The purpose of this rule is to ensure that criminal statutes provide fair warning of what behavior is considered criminal and what the punishment for that behavior will be. (*Ibid.*) But section 1108 governs the admissibility of evidence; it defines neither a crime nor punishment. The rule of lenity that applies to criminal statutes does not apply to rules of evidence. (See *Jauregi v. Superior Court* (1999) 72 Cal.App.4th 931, 943 [85 Cal.Rptr.2d 553] [the rule of lenity applicable to forfeiture statutes does not apply to a section of the Evid. Code].) Moreover, "although true ambiguities are resolved in a defendant's favor, an appellate court should not strain to interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative intent." (*People v. Avery, supra,* at p. 58.) Here we can fairly discern a legislative intent to define murder committed during the course of a rape as a sexual offense under section 1108.

■ For these reasons, we conclude that section 1108 applies at least when the prosecution accuses the defendant of first degree felony murder with rape (or another crime specified in § 1108, subd. (d)(1)), or with burglary based on the intent to commit rape (or other sex crime), the underlying felony. This conclusion avoids a difficulty inherent in the Court of Appeal's interpretation. If, as will often be the case of a killing prosecuted as a rape felony murder, the rape is separately charged, then section 1108 would certainly apply and evidence of other sexual offenses would be admissible but, under the Court of Appeal's view, only on the rape charge and not also on the murder charge. It would be difficult to instruct a jury meaningfully that it could consider the other sexual offenses in determining whether the defendant was guilty of rape, but it could not consider those offenses in determining whether the defendant was guilty of murder in the course of rape. This difficulty is avoided by interpreting the applicable sexual offenses to include murder during the course of a rape.

■ The conclusion that section 1108 applies does not end the inquiry into whether the trial court correctly admitted the evidence. Section 1108 preserves the trial court's discretion to exclude evidence under section 352 if

its prejudicial effect substantially outweighs its probative value. (See *People v. Falsetta, supra,* 21 Cal.4th at p. 916; *People v. Pierce, supra,* 104 Cal.App.4th at p. 900.) In deciding whether to exclude evidence of another sexual offense under section 1108, "trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta, supra,* at p. 917.) Like any ruling under section 352, the trial court's ruling admitting evidence under section 1108 is subject to review for abuse of discretion. (*People v. Kelly* (2007) 42 Cal.4th 763, 783 [68 Cal.Rptr.3d 531, 171 P.3d 548]; *People v. Pierce, supra,* 104 Cal.App.4th at p. 901.)

The court did not abuse its discretion in this case. It carefully considered the evidence, found it had significant probative value—as it did—and took steps to minimize any undue prejudice. It limited the evidence to what was relevant. For example, as in *People v. Pierce, supra,* 104 Cal.App.4th at page 901, the court "disallowed inflammatory evidence about [the victim's] injuries." It also ensured that the evidence would not take long to present. The ruling came well within the court's discretion.

Because the trial court properly admitted the evidence under section 1108, we do not consider whether, as the Court of Appeal also concluded, the trial court abused its discretion in further finding that the evidence was admissible under section 1101. (See generally *People v. Kelly, supra,* 42 Cal.4th at pp. 782–787.)

B. *Sufficiency of the Evidence*

As previously noted, murder committed in the perpetration or attempt to perpetrate rape or burglary is first degree murder. (Pen. Code, § 189.) The trial court instructed the jury on felony murder, with both rape and burglary as the underlying felonies. The burglary was based on defendant's entering Vickers's apartment with the intent to rape her. The court instructed the jury on no other theory of first degree murder. The Court of Appeal found the evidence insufficient to support a felony-murder finding. Presumably, the reason it did so in addition to reversing the judgment on other grounds is that "an appellate ruling of legal insufficiency is functionally equivalent to an acquittal and precludes a retrial." (*People v. Hatch* (2000) 22 Cal.4th 260, 272 [92 Cal.Rptr.2d 80, 991 P.2d 165], citing *Burks v. United States* (1978)

437 U.S. 1, 16–17 [57 L.Ed.2d 1, 98 S.Ct. 2141].) Because the Court of Appeal found insufficient evidence to support the only theory presented at trial for first degree murder, when it reversed the judgment it presumably intended to limit any retrial to second degree murder, although its opinion does not specifically so state.

The standard of appellate review of the sufficiency of the evidence to support a jury verdict is settled. "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) . . . The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. (*People* v. *Stanley* (1995) 10 Cal.4th 764, 792 [42 Cal.Rptr.2d 543, 897 P.2d 481].) ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' (*Id.* at pp. 792–793.)" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

The Court of Appeal agreed there was sufficient evidence to support a finding that defendant was Vickers's assailant, and that the two had sexual intercourse before defendant strangled her. The semen stain on the bed and the white discharge in the vagina virtually compel the latter conclusion. But it held that there was no evidence from which a reasonable jury could conclude that defendant entered Vickers's apartment intending to rape her, or that Vickers failed to consent to the intercourse, or that she resisted defendant in the way the court believed the law of rape required in 1976. We disagree.

The Court of Appeal ignored the evidence of defendant's other sexual offenses, presumably because it had concluded that the trial court should not have admitted the evidence. If so, the Court of Appeal erred in two respects. First, as previously discussed, the trial court properly admitted the evidence. Second, when reviewing the sufficiency of the evidence for purposes of deciding whether retrial is permissible, the reviewing court must consider *all* of the evidence presented at trial, including evidence that should not have been admitted. "[W]here the evidence offered by the State and admitted by the trial court—whether erroneously or not—would have been sufficient to

sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial." (*Lockhart v. Nelson* (1988) 488 U.S. 33, 34 [102 L.Ed.2d 265, 109 S.Ct. 285].) Accordingly, "a reviewing court must consider all of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause . . . ." (*Id.* at p. 41.) We have followed the high court in this regard. (*People v. Venegas* (1998) 18 Cal.4th 47, 94–95 [74 Cal.Rptr.2d 262, 954 P.2d 525], quoting *Lockhart v. Nelson, supra,* 488 U.S. at p. 40 [" '[r]etrial of this case is not precluded, since the erroneously admitted evidence was sufficient to permit a finding of guilt beyond a reasonable doubt' "]; *People v. Mattson* (1990) 50 Cal.3d 826, 853, fn. 16 [268 Cal.Rptr. 802, 789 P.2d 983] ["The high court held there that mere trial court error in the admission of evidence does not preclude retrial if, with the erroneously admitted evidence, there was sufficient evidence to support the judgment of conviction."].)

Defendant suggests that, because the Court of Appeal did not specifically state that it was *not* considering the evidence of his other sexual offenses, maybe it did consider that evidence and simply found it insubstantial. If so, the opinion gives no hint of this and no explanation why that evidence did not support the verdict. In fact, the evidence of defendant's other offenses provides compelling evidence that defendant entered Vickers's apartment intending to rape her and that he killed her during the course of rape.

The evidence showed that defendant is a serial rapist, and that his raping conduct began before he killed Vickers and continued afterwards. The other four sexual assaults were quite similar in a number of respects to each other and to the crime of this case. In each case, defendant entered an acquaintance's home at night uninvited, and proceeded to rape, or attempt to rape, the victim. (The first victim, Maureen E., did not specifically testify about an actual rape—possibly because defendant knocked her unconscious with his gun at one point and strangled her into unconsciousness at another point—but the jury could reasonably have found that he entered the home with the intent to rape and had at least attempted to rape her.) The victims had generally previously spurned defendant's sexual advances, as the jury could reasonably have found Vickers had done. On three of the occasions, defendant used a gun to prevent resistance and, on two occasions, he choked the victim in a manner similar to the way the evidence showed that he strangled Vickers.

This pattern of conduct "provides ample evidence for a reasonable jury to find that defendant intended to rape [the victim] when he killed her." (*People v. Kelly, supra,* 42 Cal.4th at p. 789.) "The chance that defendant acted with innocent intent with [the murder victim] is sharply reduced by

evidence that he committed a forcible, nonconsensual sex act upon [a different victim] a few months earlier." (*People v. Stitely* (2005) 35 Cal.4th 514, 532 [26 Cal.Rptr.3d 1, 108 P.3d 182], citing *People v. Carpenter* (1997) 15 Cal.4th 312, 379 [63 Cal.Rptr.2d 1, 935 P.2d 708].) This latter observation is all the more compelling here, where defendant committed *four* sexual assaults, two before and two after he killed Vickers. A reasonable jury was not required to find that the one time defendant actually killed his victim was the one time he had no intent to rape. "Nothing in this case required the jury to find that [the murder victim] was an exception to the pattern . . . ." (*People v. Kelly, supra*, at p. 789.) Accordingly, when the evidence of the other sexual assaults is considered, the evidence supporting the jury's verdict was not insufficient, but extremely strong.

Moreover, even disregarding the other sexual assaults, ample evidence supported the verdict. Defendant joined Vickers's group at the Saint James Infirmary the night she died. He propositioned one woman in the group (or so the jury could reasonably conclude), then was observed speaking to Vickers. Vickers shook her head no, then turned her back on defendant as if she did not want to speak with him further. When the group left, Vickers asked one friend to come home with her, but the friend declined. As they were leaving, defendant was observed whispering something to Vickers, and Vickers again shook her head no. Eventually, Vickers left alone in her car, driving in the direction of her home, and, after Vickers left, defendant drove alone in the same direction. A jury could reasonably conclude that Vickers's asking the friend to come home with her showed she did not intend or wish to engage in sex with defendant, or anyone, that night. From all of this evidence, a jury could reasonably infer that Vickers had declined defendant's sexual overtures, or at least that she had not desired or intended to engage in sex with him. The Court of Appeal dismissed these inferences as mere "speculation." They are not speculation. They are reasonable inferences based on specific circumstantial evidence.

The crime scene presented additional strong evidence of absence of consent. Vickers was menstruating when she died. A bloody tampon, obviously removed from Vickers's body before sex, was found lying on the bed next to her body. A jury could reasonably find it highly unlikely a woman who consented to sex would simply place a bloody tampon on the bed beside her rather than dispose of it properly. The tampon on the bed strongly suggests a victim acting under compulsion, not a willing partner acting consensually.

Finally, the circumstance that defendant strangled Vickers to death strongly evidences lack of consent to sexual intercourse. It is possible, we suppose, that the two engaged in consensual sex, then defendant strangled her for no

apparent reason. But the jury was not compelled to so find. The strangulation strongly suggests absence of consent. "[A] rational trier of fact could have rejected, beyond a reasonable doubt, the following scenario that defendant suggests, to wit, that he engaged in consensual sexual intercourse *and only thereafter* turned to violence: such a trier could have concluded to the requisite degree of certainty that violence accompanied sex." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1084 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

Rather than focus on the evidence that actually existed, the Court of Appeal "focused on what it found *lacking* in the prosecution's case . . . ." (*People v. Rodriguez, supra*, 20 Cal.4th at p. 12.) "There was no sexual trauma to the vagina," the Court of Appeal said, "no evidence of restraints used during the sex act and no other injuries to her body from which the jury could infer that Ms. Vickers physically resisted her attacker during the sex act, or her attacker inflicted physical violence on her during the sex act." "The lack of evidence of any injury to Ms. Vickers," the court continued, "other than those inflicted when she was strangled, does not allow a reasonable jury to simply know beyond a reasonable doubt that Ms. Vickers's murderer intended to force her to have sex with him before killing her." Finally, the court noted that "there was no evidence of resistance. The bed was undisturbed on one side indicating that there was not a struggle; the downstairs neighbor did not hear any disturbance; there was no evidence of restraints used during the sex act; there was no bruising to her body other than that caused by the actual strangulation; and there was no vaginal trauma. Furthermore, there was no evidence that the murderer brandished a gun or any other weapon with which he threatened Ms. Vickers so that she did not resist."

The Court of Appeal erred in focusing on evidence that did not exist rather than on the evidence that did exist. (*People v. Rodriguez, supra*, 20 Cal.4th at p. 12.) This is especially true here, where the absence of unambiguously sexual injuries and evidence of a struggle can be easily explained and, hence, is of little significance. Defendant may simply have used a gun—as he did in three other sexual assaults both before and after he killed Vickers—or some other means to prevent resistance and force his victim to submit quietly. The physical evidence does not speak either way as to whether defendant used a gun; if he did, he undoubtedly removed it from the crime scene. But, under the circumstances of this case, a jury could reasonably infer that the most likely explanation for the absence of evidence of a struggle is that defendant did use a weapon, or other form of coercion, to prevent such a struggle—not that Vickers engaged in consensual sex with defendant after he came to her apartment late at night and before he strangled her.

The Court of Appeal relied in part on the fact that this 1976 crime was governed by the law of rape as it existed at that time. "Until its amendment in 1980, [Penal Code] former section 261, subdivisions 2 and 3 defined rape as an act of sexual intercourse under circumstances where the person resists, but where 'resistance is overcome by force or violence' or where 'a person is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution . . . .' " (*People v. Barnes* (1986) 42 Cal.3d 284, 292 [228 Cal.Rptr. 228, 721 P.2d 110].) But even the law in effect in 1976 did not force a person to resist a demand for sex at the risk of death or serious injury. "In our state, it had long been the rule that the resistance required by former section 261, subdivision 2, was only that which would reasonably manifest refusal to consent to the act of sexual intercourse." (*Id.* at p. 297.) Moreover, the fact that defendant strangled his victim to death after the sexual intercourse permits a reasonable jury to infer that Vickers *did* resist and, indeed, died for that resistance. The fact that the law of rape was somewhat different in 1976 than it is today provides no basis for the Court of Appeal to substitute its interpretation of the evidence for that of the jury. The evidence of this case fully supports the jury's verdict.

### C.   Due Process Issue

In addition to the issues already discussed, defendant contended in the Court of Appeal that the delay in bringing charges for this 1976 crime violated "his due process right to a fair trial and the trial court erred in refusing to dismiss" the charges. The Court of Appeal discussed the issue extensively, but ultimately concluded that its ruling reversing the judgment on other grounds "renders moot defendant's contention that he was denied due process and a fair trial."[4]

The Attorney General argues that portions of the Court of Appeal's analysis of the due process issue compel the conclusion there was no violation. (See generally *People v. Nelson* (2008) 43 Cal.4th 1242, 1249–1257 [78 Cal.Rptr.3d 69, 185 P.3d 49].) Accordingly, he contends that the proper remedy at this point is to remand the matter to the Court of Appeal with instructions to simply apply that analysis and affirm the judgment of the trial court. We disagree. The Court of Appeal reached no definitive conclusion despite its extensive discussion of the issue. It should decide the issue in the first instance on remand.

---

[4] The court erred in this regard also. A reversal on grounds that would permit a retrial, albeit, under the Court of Appeal's holding, limited to second degree murder, did not make moot defendant's argument that the charges should be dismissed entirely.

### III. CONCLUSION

We reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.