[No. G044232. Fourth Dist., Div. Three. Mar. 20, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
LEONEL GARCIA, Defendant and Appellant.

[black redacted block]

[black redacted block]

## Counsel

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry Carlton and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MOORE, J.**—A jury found defendant Leonel Garcia guilty of four counts of attempted murder and three other felonies, and found true gang and personal discharge of a firearm enhancements.[1] He appeals contending the court erred in instructing the jury on attempted murder, the evidence was insufficient to support two of the four counts of attempted murder, he was denied a unanimous verdict on six of the seven guilty verdicts, and the court erred in calculating his presentence credits. The Attorney General agrees defendant is entitled to additional presentence credits.

We reverse the convictions on counts one, two, three, four, six, and seven and the true findings on the enhancements attached to those counts because defendant was denied a unanimous verdict by 12 jurors. We affirm defendant's conviction and the gang enhancement on count five: 12 jurors announced their verdict on that count. We do not address defendant's contention that the trial court erred in instructing the jury on the attempted murder charges because the reversal of the attempted murder convictions

---

[1] Jesse Benitez was charged as a codefendant in the attempted murder counts and was tried with Garcia, but is not a party to this appeal.

(counts one through four) renders the issue moot. We do not address defendant's credit calculation argument for the same reason. We do address his sufficiency of the evidence argument due to double jeopardy implications, but find the argument lacks merit.

## I

## FACTS

Garcia was charged in the information with seven charges arising out of an incident on April 18, 2007: four counts of attempted murder (Pen. Code,[2] §§ 664, subd. (a), 187, subd. (a); counts one through four), possession of a firearm by a minor (former § 12101, subd. (a)(1); count five), gang member in possession of a loaded firearm in public (former § 12031, subd. (a)(1), (2)(C);[3] count six), and active participation in a criminal street gang (§ 186.22, subd. (a); count seven). The information also alleged counts one through six were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and defendant personally discharged a firearm in connection with each of the attempted murders (§ 12022.53, subd. (c)).

The court excused a juror during deliberations. After the juror was excused and replaced with an alternate, the court was informed the jury had previously reached a verdict on all but one count. The court sealed the verdicts. The newly constituted jury then deliberated and ultimately reached a verdict on the remaining count and its enhancement. Defendant was found guilty on all counts and all enhancements were found true. The court sentenced defendant to 37 years in state prison, consisting of a seven-year (midterm) commitment on count one and consecutive terms of 10 years and 20 years, respectively, on the gang enhancement (§ 186.22, subd. (b)(1)) and personal discharge of a firearm enhancement (§ 12022.53, subd. (c)) found true in connection with count one. The court imposed concurrent seven-year terms on the three remaining counts of attempted murder, struck the enhancements attached to those counts, and stayed the sentences on the remaining offenses pursuant to section 654.

### The Shooting

The relevant facts from the trial are as follows.[4] On April 18, 2007, about 5:30 p.m., off-duty Santa Ana Police Officer Jeffrey Van Es was in a vehicle

---

[2] All undesignated statutory references are to the Penal Code.

[3] See now section 25850, subdivisions (a), (c)(3).

[4] As defendant does not contest the sufficiency of the evidence of the gang offense and enhancements, we do not discuss the gang evidence in any detail.

eastbound on 18th Street and stopped at the intersection of 18th Street and Pomona Avenue, when he heard what he believed were two gunshots. He then heard four to six more gunshots in rapid succession, all coming from south of 18th Street. Van Es looked to the south and saw five males running northbound to 18th Street and around the corner to a bright blue Toyota. Van Es thought the males appeared to be gang members. He said four appeared to be Hispanic, one had darker skin and was possibly Black. The males jumped into the Toyota, which appeared to be waiting for them. The Toyota drove eastbound on 18th Street. Van Es called 911 and reported what he had observed. The vehicle Van Es was in followed the Toyota.

The Toyota eventually stopped in the street about a mile after a marked police vehicle started following it. There were seven males between the ages of 15 and 20 inside the Toyota. The driver, David Ramirez, was a self-admitted active participant of the Fearless Crowd criminal street gang. The right front passenger, Oswald Gomez, was an active participant in Fearless Crowd. Of the five individuals in the backseat, Daniel Saldana was an active participant in the criminal street gang Varrio Little Town, as were Cesar Pedrosa and Ricardo Canela. Armando Dominguez was previously arrested for spray-painting Varrio Little Town graffiti. Fearless Crowd and Varrio Little Town are allies. The last passenger, Michael Seward, was associated with Varrio Chico, a criminal street gang in south Orange County. He had since moved to Costa Mesa. Two folding knives and an 18- to 24-inch aluminum baseball bat were found in the passenger compartment of the car.

A police officer who worked on the gang detail responded to the location of the Toyota. He knew six of the seven occupants. The officer said the territory in which the shooting occurred was claimed by the Puro Maravilla (Maravilla) gang. The occupants of the Toyota were members of Maravilla's rivals. The officer said rivals who enter Maravilla territory armed with weapons could be looking for a violent confrontation, and those who walk in do so on the fringe of the territory, assault someone and get out quickly. According to the gang expert, Benitez and defendant were active participants in Maravilla.

The occupants of the Toyota did not testify. Gabriela S. was the lone eyewitness to the shooting. She lived in the area of the shooting. She was cleaning out her automobile when she heard a male yelling obscenities and looked in his direction. She saw two males, 16 or 17 years old, running. She heard them yell, "come on, come on," in a frightened tone. When the two males were about 13 or 14 feet from her, one of them, Benitez, shouted and the other, defendant, turned and fired a shot with his arm raised. Benitez put his hands on defendant's shoulders and said, "let's go, let's go." They started running again. Defendant paused after running 16 or 17 feet and fired a second shot. Then he started running again.

Gabriela S. said there were four males in the direction defendant shot. One had a baseball bat in his hand and pointed it in a threatening manner. The four were standing when defendant fired the first shot and crouched down behind a car by the time defendant fired the second shot.[5] One got up and ran toward 18th Street. The others remained behind the car, shouting obscenities.

*Replacement of Jurors*

Jury selection began on February 4, 2009,[6] and the matter was submitted to the jury on February 23. On February 24, the jury sent three notes to the court. The first indicated Juror No. 174 needed to be replaced because the juror would be unable to serve after 4:30 p.m. that afternoon. The second suggested that as Juror No. 181 would also have to subsequently be replaced, the court might want to excuse both jurors at the same time so deliberations would not have to begin anew twice. The jury informed the court it anticipated deliberating "three more days."

The court replaced Juror No. 174 on February 24. Before an alternate was seated to replace Juror No. 174, the court asked the remaining 11 jurors if any verdicts had been reached. The foreperson said the jury had not reached any verdicts. The court then seated an alternate juror and instructed the jury to start deliberations over from the beginning. (§ 1089; CALCRIM No. 3575.)

The next morning, on February 25, the attorneys suggested keeping Juror No. 181 on the newly constituted jury and, if at the end of the day the jury believed it would need additional time to deliberate, Juror No. 181 could be excused at that time and an alternate seated to replace Juror No. 181 when court resumed on the morning of February 26.

On the afternoon of February 25, the court excused Juror No. 181 outside the attorneys' presence. The next morning, after the court had already excused Juror No. 181, the court asked the attorneys if they agreed Juror No. 181 might be excused and the final alternate seated on the jury. The court seated the last alternate and again instructed the jury to begin its deliberations anew. The court then asked whether the jury had previously reached any verdicts. The foreperson said it had and that the verdicts had been reached while Juror No. 181 was still a member of the jury. The court stated its intent to seal the verdicts. The attorneys agreed to the court's intended action. The attorneys also agreed the sealed verdicts represented the verdict of Juror No. 181. The court did not explain to defendant his rights under article I, section 16 of the California Constitution and defendant did not state an acknowledgement of his rights or an intent to waive them.

---

[5] Gabriela S. said she heard a total of two shots.

[6] All future references to dates are in 2009 unless otherwise stated.

The verdicts sealed by the court were on all the counts with the exception of count five, minor in possession of a concealable firearm. On March 2, the newly constituted jury informed the court it had a verdict on the remaining count. When the jury returned to the courtroom, the court accepted all the guilty verdicts and true findings. Counsel asked that the jury be polled and the court polled the 11 jurors who participated in the verdicts and findings relating to all counts but count five, when Juror No. 181 was on the panel. The court then polled all the jurors on the verdict and finding on count five. Eleven days later the court had former Juror No. 181 brought back into court. She said the verdicts that had been sealed were hers.

## II

## DISCUSSION

### A.  *Defendant Was Denied Unanimous Jury Verdict*

Defendant maintains he was denied a unanimous verdict by 12 jurors in connection with those verdicts and findings sealed by the court after Juror No. 181 had been excused the afternoon before. We agree.

"Article I, section 16 of the California Constitution provides: 'Trial by jury is an inviolate right and shall be secured to all . . . . A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel. . . . [¶] In criminal actions in which a felony is charged, the jury shall consist of 12 persons. In criminal actions in which a misdemeanor is charged, the jury shall consist of 12 persons or a lesser number agreed on by the parties in open court.' Our state Supreme Court has 'recognized that this state constitutional right is fundamental. [Citation.]' (*People v. Collins* (2001) 26 Cal.4th 297, 304 [109 Cal.Rptr.2d 836, 27 P.3d 726].)" (*People v. Traugott* (2010) 184 Cal.App.4th 492, 499–500 [109 Cal.Rptr.3d 66] (*Traugott*).)

An essential element of this constitutional right is a unanimous verdict by 12 jurors. (*Traugott, supra*, 184 Cal.App.4th at p. 500, citing *People v. Collins* (1976) 17 Cal.3d 687, 693 [131 Cal.Rptr. 782, 552 P.2d 742].) For unanimity to be found, "[t]he jurors must appear in court and be asked 'whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same.' [Citation.]" (*Traugott, supra*, 184 Cal.App.4th at p. 500.)

The presence of the jurors to affirm the verdict is not only necessary to assure unanimity, "it is 'the oral declaration of the jurors, not the submission of the written verdict forms [that] constitutes the *return* of the

verdict.' (*People v. Green* (1995) 31 Cal.App.4th 1001, 1009 [38 Cal.Rptr.2d 401] (*Green*); see also *Stalcup v. Superior Court* (1972) 24 Cal.App.3d 932, 936 [101 Cal.Rptr. 467] [the unanimous oral declaration of the jurors is the true return of the verdict], disapproved on another point in *People v. Dixon* (1979) 24 Cal.3d 43, 50 [154 Cal.Rptr. 236, 592 P.2d 752].) Thus, 'there is no verdict absent unanimity in the oral declaration.' (*Green, supra,* at p. 1009.)" (*Traugott, supra,* 184 Cal.App.4th at p. 500.)

As in the present case, the trial court in *Traugott* was informed the jury had a verdict, but that only 11 of the jurors were present. (*Traugott, supra,* 184 Cal.App.4th at p. 496.)[7] Unlike *Traugott,* here the trial court was informed the jury had reached a partial verdict *after* the court had already discharged and replaced one of the jurors who had purportedly voted in favor of the verdicts. Regardless, in each case the court accepted a verdict or verdicts for which only 11 jurors were present to affirm, and thus return, the verdict(s).

■ "[T]he right to an oral affirmation of the verdicts by the jurors is not a mere procedural formality." (*Traugott, supra,* 184 Cal.App.4th at p. 501.) If 12 jurors are not present to affirm the verdict, the verdict cannot be accepted and entered in the minutes. "[B]ecause the defendant has a constitutional right to a unanimous jury [citation], . . . sections 1163[8] and 1164[9] clarify that there is no verdict absent unanimity in the oral declaration. [Citation.]" (*Green, supra,* 31 Cal.App.4th at p. 1009.) Section 1147 also insists on the presence of the 12 jurors for the verdict to be entered in the minutes. "When the jury have agreed upon their verdict, they must be conducted into court by the officer having them in charge. Their names must then be called, and *if all do not appear, the rest must be discharged without giving a verdict.* In that case the action may be again tried." (§ 1147, italics added.) ■ The unanimity required for a valid verdict cannot be obtained when only 11 jurors are present to affirm it.

[7] The remaining juror in *Traugott* left for a 4:00 p.m. job interview. (*Traugott, supra,* 184 Cal.App.4th at p. 498.)

[8] "When a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severally asked whether it is their verdict, and if any one answer in the negative, the jury must be sent out for further deliberation." (§ 1163.)

[9] "(a) When the verdict given is receivable by the court, the clerk shall record it in full upon the minutes, and if requested by any party shall read it to the jury, and inquire of them whether it is their verdict. If any juror disagrees, the fact shall be entered upon the minutes and the jury again sent out; but if no disagreement is expressed, the verdict is complete, and the jury shall, subject to subdivision (b), be discharged from the case.

"(b) No jury shall be discharged until the court has verified on the record that the jury has either reached a verdict or has formally declared its inability to reach a verdict on all issues before it, including, but not limited to, the degree of the crime or crimes charged, and the truth of any alleged prior conviction whether in the same proceeding or in a bifurcated proceeding." (§ 1164.)

The Attorney General contends defendant received unanimous verdicts on the contested counts because 11 jurors affirmed it in court and the 12th juror (Juror No. 181) affirmed it in court 11 days later. When the court accepted the verdicts on counts one, two, three, four, six, and seven, only 11 jurors affirmed the verdicts. Juror No. 181 had already been excused. The court's entry of the verdicts on March 2 was improper because contrary to the Constitution and sections 1147, 1163, and 1164, 12 jurors did not declare the verdicts to be theirs. On March 13, when the court sought to obtain affirmation of the verdicts on counts one, two, three, four, six, and seven from the 12th juror, it did not have a sworn juror before it to affirm the verdicts. It had a *former* juror (Juror No. 181) in court. Indeed, on March 13 not only had Juror No. 181 previously been discharged and replaced with another juror, the entire jury had been discharged. Former Juror No. 181 could no more be considered a sitting juror for purposes of affirming a verdict than the court could reconvene a discharged jury upon discovering the jury had failed to determine the degree of a crime (see § 1157) for which it found a defendant guilty. (*People v. Lee Yune Chong* (1892) 94 Cal. 379 [29 P. 776].)

■ A jury verdict is either complete, incomplete, or otherwise irregular. The verdict is complete when it has been rendered in compliance with section 1164. In other words, when the verdict is " ' "received and read by the clerk, acknowledged by the jury, and recorded." ' " (*People v. Bonillas* (1989) 48 Cal.3d 757, 770 [257 Cal.Rptr. 895, 771 P.2d 844].) If the jury has been discharged after rendering a complete verdict, " ' "the trial court has no jurisdiction to reconvene the jury regardless of whether or not the jury is still under the court's control . . . ." ' " (*Id.* at pp. 770–771, fn. omitted.) The verdicts on the challenged counts were not complete because the verdicts had not been affirmed by the 12 jurors who rendered them.

■ If a complete verdict has not been rendered (i.e., the verdict is incomplete or otherwise irregular), " ' "jurisdiction to reconvene the jury depends on whether the jury has left the court's control. . . ." ' " (*People v. Bonillas, supra*, 48 Cal.3d at p. 771.) " '[O]nce the court loses control over the jurors, it is without jurisdiction to call them together again.' " (*Ibid.*; see also *People v. Hendricks* (1987) 43 Cal.3d 584, 596–599 [238 Cal.Rptr. 66, 737 P.2d 1350]; *People v. Bolter* (1991) 227 Cal.App.3d 653, 659–662 [278 Cal.Rptr. 123].) Here the court excused Juror No. 181 on February 25. The verdicts Juror No. 181 purportedly reached with 11 other jurors were given to the court on February 26, *after* Juror No. 181 had already been discharged and was no longer in court. The remaining 11 jurors and the juror who replaced Juror No. 181 were discharged on March 2. If the court could not reconvene those jurors because it lost jurisdiction over them, the court must perforce have lost jurisdiction over Juror No. 181 and could not attempt to have her affirm the verdicts. Having lost jurisdiction over Juror No. 181, the court's acts of bringing her back to court on March 13 and having her affirm

the disputed verdicts as hers "were nullities." (*People v. Lee Yune Chong, supra,* 94 Cal. at pp. 384–385.)

■ Neither did defendant waive his right to a unanimous jury. The right to a unanimous verdict is constitutional in nature and must be *personally* waived by the defendant. "A jury may be waived in a criminal cause by the consent of both parties expressed in open court *by the defendant and* the defendant's counsel." (Cal. Const., art. I, § 16, italics added.) "A waiver of the right to a jury trial requires an express waiver *by the defendant* in open court. (*People v. Ernst* (1994) 8 Cal.4th 441, 448, 34 Cal.Rptr.2d 238, 881 P.2d 298.) 'Waiver by counsel is not sufficient . . . .' (*In re Tahl* (1969) 1 Cal.3d 122, 131 [81 Cal.Rptr. 577, 460 P.2d 449].)" (*Traugott, supra,* 184 Cal.App.4th at p. 500.) "[C]onsent to a jury of fewer than 12 persons must be expressed by the defendant in open court. [Citations.]" (*Id.* at p. 501.) The court did not obtain defendant's consent in this matter.

Here, the issue of excusing a juror and the possibility of the jury having reached a verdict before the juror was excused initially arose in connection with the court excusing and replacing Juror No. 174. Although codefendant's attorney originally asserted a verdict reached by the jury before Juror No. 174 was excused would be a valid verdict, all counsel agreed any such verdicts reached prior to excusing Juror No. 174 should be sealed. Juror No. 174 was not a member of the jury at the time the contested verdicts were reached; however, the attorneys agreed to the court sealing the verdicts at issue. Defendant was not informed such action could not be taken without his consent. Defendant was not informed of his constitutional right to have the 12 jurors who render a verdict present to affirm it before the verdict(s) may be entered. Indeed, defendant was not asked to consent to the sealing of the verdicts or asked whether he waived his right to a unanimous 12-person verdict.

■ " '[A] defendant's consent to be tried by less than 12 persons must be as formal as a waiver of the entire jury.' [Citation.] Like a waiver of the right to trial by jury, the consent or stipulation by defendant's counsel to a jury of fewer than 12, without the express consent of defendant, is ineffective. [Citations.]" (*Thaugott, supra,* 184 Cal.App.4th at p. 501.) The agreement of the prosecutor, codefendant's counsel, and defendant's counsel notwithstanding, defendant did not consent to a verdict of less than 12 jurors.

■ In conclusion, we point out that when the court is going to discharge a deliberating juror and replace that juror with an alternate, the court should determine whether any verdicts have been reached *before* discharging the juror. In such a case, the jury may render a partial verdict, all 12 jurors can then affirm the verdict(s), and the verdict(s) may be recorded pursuant to

section 1164. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1100–1101 [31 Cal.Rptr.2d 321, 875 P.2d 36] [replacement of juror in death penalty case after jury reached verdict in guilt phase]; *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1485 [267 Cal.Rptr. 865] [trial court did not err in receiving partial verdict before replacing juror]; *People v. Aikens* (1988) 207 Cal.App.3d 209, 211 [254 Cal.Rptr. 30] [same]; see also *People v. Fields* (1983) 35 Cal.3d 329, 351, fn. 9 [197 Cal.Rptr. 803, 673 P.2d 680] [recognizing unforeseen circumstances may arise requiring replacement of a juror after verdict in guilt phase of death penalty case].) The juror may then be discharged, an alternate seated to replace the juror, and the newly constituted jury instructed to begin its deliberations anew on any remaining charges and allegations. (§ 1089; CALCRIM No. 3575.) When the court learns of a partial verdict *after* a juror who purportedly voted for the verdict(s) has been excused, the court may accept the partial verdict *if* the defendant then *personally* waives his right to a verdict of 12 jurors. Otherwise, such a verdict is not valid.

Defendant was denied his state constitutional right to a unanimous verdict on counts one, two, three, four, six, and seven. These convictions must, therefore, be reversed. The reversal renders moot defendant's arguments regarding jury instructions and the calculation of presentence credits. We address defendant's sufficiency of the evidence argument due to its double jeopardy implications. (*People v. Belton* (1979) 23 Cal.3d 516, 527, fn. 13 [153 Cal.Rptr. 195, 591 P.2d 485].)

### B. *Sufficiency of the Evidence*

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].) "In reviewing sufficiency of evidence claims, each case of necessity must turn on its own particular facts. [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 745 [37 Cal.Rptr.3d 163, 124 P.3d 730].) We do not reweigh the evidence or reevaluate the credibility of witnesses. (*People v. Story* (2009) 45 Cal.4th 1282, 1296 [91 Cal.Rptr.3d 709, 204 P.3d 306].)

Relying upon *People v. Perez* (2010) 50 Cal.4th 222 [112 Cal.Rptr.3d 310, 234 P.3d 557] (*Perez*), defendant argues the two shots fired while defendant was across the street from the four rival gang members supports at most two counts of attempted murder. In *Perez*, the defendant fired a single bullet from

a moving motor vehicle at a group of seven police officers and a civilian standing less than 15 feet from each other. Based on that one act, the jury convicted Perez of seven counts of attempted murder of a peace officer and one count of attempted murder (the civilian). (*Id.* at p. 224.) The Supreme Court found the single shot did not support eight counts of attempted murder. (*Id.* at p. 234.)

When a defendant is charged with the attempted murders of multiple individuals, the defendant may not be convicted on all counts absent proof he intended to kill each of the victims. " ' "[G]uilt of attempted murder must be judged separately as to each alleged victim." ' [Citation.]" (*Perez, supra,* 50 Cal.4th at p. 230.) Shooting at a group from a distance at which a mortal wound could be inflicted supports an inference of an intent to kill. (*Ibid.*) But a single act would not ordinarily support multiple counts of attempted murder. (*Id.* at pp. 230–231; but see *People v. Smith, supra,* 37 Cal.4th at pp. 746–747 [single shot at mother and baby seated one right behind the other in a vehicle directly in the defendant's line of fire, supported an inference the defendant intended the single bullet to kill both].) Defendant extrapolates from *Perez* that firing two shots at the rival gang members supports, at most, two counts of attempted murder.

However, although Gabriela S. testified defendant fired two shots, there was evidence he fired more than two shots. Officer Van Es heard two shots and then heard four to six more shots fired, followed by the victims running from the area of the shots. The victims jumped into what appeared to have been a waiting Toyota and were driven from the scene. The Toyota was followed by the off-duty police officer and later by a marked police vehicle. It eventually stopped and the occupants were taken out of the vehicle by police. A search of the vehicle revealed two knives and a baseball bat. No gun was found. The occupants of the Toyota were not seen disposing of a gun either. The jury could reasonably conclude the only one with a gun during the confrontation was defendant and he fired six to eight shots at the victims with the intent to kill each of them. Firing six to eight shots at four people with the intent to kill each one or all of them, supports the four convictions for attempted murder.

Because we find the jury could reasonably have found defendant fired six to eight shots at the victims with the intent to kill each of the victims, and conclude the convictions are supported by substantial evidence, we need not address the Attorney General's contention that the evidence would be sufficient to support four counts of attempted murder even if the jury found defendant fired but two shots toward the four alleged victims.

### III

### DISPOSITION

The convictions on counts one, two, three, four, six, and seven and the enhancements found true in connection with those counts are reversed. The conviction on count five and the true finding on the gang enhancement attached thereto are affirmed. The case is remanded to the trial court for further proceedings.

O'Leary, P. J., and Ikola, J., concurred.