Filed 6/28/13  In re E.A. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.A., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>E.A.,<br><br>        Defendant and Appellant. | A134639<br><br>(Mendocino County Super. Ct. No. SCUKJDSQ11153302002) |

Eighteen-year-old E.A. (appellant) appeals from the juvenile court's dispositional order sustaining allegations that he committed misdemeanor assault (Pen. Code, § 240,[1] count one), misdemeanor assault against a peace officer (§ 241, subd. (c), count two), and misdemeanor threats directed at a public officer (§ 71, count three).  Appellant contends: (1) the court's order as to assault (count one) must be reversed because assault is a necessarily included offense of assault against a peace officer (count two); (2) there was insufficient evidence to sustain the petition as to count two; and (3) there was insufficient evidence to sustain the petition as to count three.  We agree, and the Attorney General concedes, that the order as to count one must be reversed.  We reject the remaining contentions and affirm the order in all other respects.

---

[1]  All further statutory references are to the Penal Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On May 31, 2011, a juvenile petition was filed alleging appellant committed felony assault with a deadly weapon (§ 245, subd. (a)(1), count one), misdemeanor assault against a peace officer (§ 241, subd. (c), count two), and misdemeanor threats directed at a public officer (§ 71, count three). At a contested jurisdictional hearing, Mendocino County Sheriff's Department Animal Control Officer Torsten Werner testified that on May 30, 2011 he went to appellant's house to conduct an investigation after receiving a call from dispatch and information from an alleged victim that a pit bull with a white spot on its chest had attacked and killed a cat. Werner knocked on the door of appellant's home and heard some dogs barking, but could not determine how many there were. When appellant's mother answered the door, a brown dog ran out of the house and tried to attack Werner. Werner chased the dog off and told appellant's mother to put the dog inside the house; she complied. Werner explained he had received a complaint that one of her dogs was involved in an attack. Appellant's mother, who had been speaking in English to him, said she did not "know anything about it" and that she did not speak English.

At that point, appellant appeared next to his mother at the door. Werner explained the purpose of his visit and said he wanted to see all of the dogs that were inside the house. Appellant was not cooperative and became increasingly "irritated." Werner explained again why he was there and asked that appellant bring the dogs out on leashes. He also told appellant that he needed to check the dogs for possible rabies exposure, and that it was a misdemeanor to "hold a dog back on [him]." Appellant walked into the house and returned with the brown dog that had charged at Werner earlier. Werner told appellant he had already seen that dog and wanted to see the others. Appellant replied, "Why? I don't understand." and said the other dog did not like being on a leash. Werner once again asked appellant to "[p]lease put the dog on the leash and show me the dog." At the time of this fourth request, Werner was standing in appellant's front yard about 20 feet away from the steps leading up to the front screen door of appellant's house, which was closed. Werner walked a little closer to the screen door and saw a pit bull mix

2

on a leash inside the house. The dog appeared to be about 45 pounds and fit the description the victim had given.

Werner instructed appellant to put that dog in his animal control van. Werner walked to his van, which was about 40 feet away, unlocked it, and opened the door. Appellant began yelling and stalling, saying he did not want to give Werner the dog; Werner became concerned that the situation was getting "a little more out of hand." Werner could not see what was going on inside of the house through the screen door but could tell appellant was getting "highly irritated." Werner backed up further from appellant's front door, fearing for his safety. Then, "in one movement," appellant took the leash off the dog, said "here's the dog," "aggressively" "opened the screen door, threw [or pushed] the dog out," said "get him, get him," and "sent the dog after [Werner]." The dog ran down the steps of the house and approximately 30 or 40 feet towards Werner in an aggressive manner. Werner, who knew based on his training that he should yell and make himself appear big in order to stop a dog attack, "yelled to the dog," "said stop," and made aggressive bodily movements to "overpower[ ] the dog's behavior." The dog stopped, appeared confused, and ran to the animal control van where he began to sniff around. Werner instructed appellant not to send the dog after him again and to put the dog inside his van. Werner then called for backup. Werner, having been attacked by two pit bulls during his first years as an animal control officer, testified he was fearful because appellant's dog was a medium- to large-sized pit bull mix and was running towards him.

Appellant testified in his own defense. He testified he woke up to hear his mother and Werner arguing at his front door. Appellant went to the door where he encountered Werner and tried to interpret for his mother. Werner told appellant he needed to see appellant's dogs because he had received a call that "the dog killed . . . the neighbor's cat." While appellant was explaining to his mother what was happening, Werner continued demanding to see the dogs. Appellant told his mother that she needed to give up the dogs and she said she understood. Appellant placed the small brown dog on a leash but Werner told appellant he had already seen that dog and wanted to see the other

3

dog. Appellant said, " 'Sure.' " He tried to get the second dog on a leash but was unable to, so he picked the dog up and brought it to the door. Werner told appellant to put the second dog on a leash. Appellant said, " 'Okay,' " and went back inside and placed a leash on the second dog. Werner yelled that appellant "was trying to harbor the animals" and informed appellant that he could arrest him.

When appellant approached the screen door with the second dog, Werner said, " 'Yeah, that's the dog. That's the dog,' " and told appellant to bring it to him and place it in his van. Appellant translated Werner's instructions for his mother, to which his mother replied, " 'Well, tell him if he wants the dog so badly, he can come get it himself.' " Appellant then said, " 'You can come get the dog.' " Werner replied, " 'What, you're trying to send the pit bull to attack me?' " Appellant said, " 'No,' " " 'Just come get him.' " Werner began backing away and "was yelling in his dispatch thing [ ] ." He told appellant that his "friends" were on their way to appellant's home. Werner opened his van and told appellant to put the dog inside. Appellant picked up the dog and carried it to the van, took off the leash, and closed the door. Appellant testified the dog never ran at Werner. Appellant also testified that the dog has a good personality and has never attacked any small animals.

Appellant's mother testified that Werner arrived at the house on May 30, 2011 at 8:00 a.m., knocked on her door very loudly, and cursed at her, threatening that if she did not give him the dog, he would have them "all arrested." She was not able to have any conversation with Werner because he was yelling. When appellant woke and came to the door, she asked appellant what was going on. Werner "kept telling [appellant and his mother] that [they] had to hand over the pit bull dog or he was going to call for help." She told appellant to get the pit bull dog, and appellant complied. When appellant brought the dog to the door, Werner backed up and yelled. Appellant's mother, who was frightened, told appellant to put the dog in the van, and he complied. The sheriffs came and handcuffed appellant.

Appellant's brother testified that he heard what sounded like an argument and saw Werner standing outside of the house. Appellant's brother heard Werner say, " 'Backup

4

is on the way. Everyone in this house is getting arrested.' " Appellant was putting the dog in a van. The dog was not acting in an agitated manner and he did not hear appellant yell. Another brother testified he was given the dog approximately four or five years ago and had cared for the dog ever since. The dog was not trained to attack and he never saw the dog attack any person or any animal. The second brother testified that the dog played with his one-and two-year-old children all the time.

On rebuttal, a probation officer familiar with appellant's family testified that his communications with appellant's mother had been "primarily confrontational, hostile, argumentative, negative, [and] . . . full of profanity." Werner took the stand again and testified that he did not curse at any of the members of appellant's family. He testified that appellant's testimony was not true and that appellant had in fact sent the dog after Werner.

After considering the testimony and counsels' arguments, the court stated, "As I listened . . . to the testimony, I was, frankly, looking for some other explanation of what he meant by 'get him' or get him when he turned the dog loose. . . [I]n terms of an explanation of this, . . . the Court would be more likely to accept it if there was some explanation for what he said at the door as he released the dog, that the Court could then think maybe that the officer misinterpreted somehow or didn't hear correctly because of the distance or something. However, then I heard the testimony of the minor and his mother, and basically it was that the officer's totally lying, that the dog was never released, that the dog stayed in his arms, he took the dog out and put him in the car. [¶] It's a case where, really, it's black or white here; one side or the other is telling the truth. As I listened to Officer Werner's testimony, I believed him. . . . [¶] . . . And there was no explanation that—saying 'get him' meant anything else other than what the officer seemed to conclude." The court sustained count one of the petition as amended to allege misdemeanor assault (§ 240), and counts two (§ 241, subd. (c)) and three (§ 71). It placed appellant on probation and ordered him to serve 18 days in juvenile hall with 18 days credit for time served.

5

*Necessarily included offense*

Appellant contends the juvenile court improperly sustained both violations of assault—counts one and two—because one is a necessarily included offense of the other. The Attorney General concedes this issue, and we conclude the trial court erred.

Multiple convictions cannot be based on necessarily included offenses. (*People v. Villa* (2007) 157 Cal.App.4th 1429, 1434.) Simple assault is a necessarily included offense of assault against an officer because "the statutory elements of the greater offense [assault against an officer] include all the elements of the lesser offense [simple assault] so that the greater offense cannot be committed without committing the lesser offense." (*People v. Cook* (2001) 91 Cal.App.4th 910, 918.) Accordingly, the court erred in making a finding on the lesser offense of simple assault (count one).

*Sufficiency of the evidence – count two, assault against a peace officer*

Appellant contends there was insufficient evidence to sustain a finding as to count two, assault against a peace officer. We disagree.

On appeal, the court reviews claims of insufficiency of evidence by examining "the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value." (*People v. Story* (2009) 45 Cal.4th 1282, 1296.) Resolution of conflicting evidence and credibility issues is for the trier of fact to decide. (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331.) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient . . . ." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Section 240 defines assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Jury instruction CALCRIM No. 915 provides that to prove the defendant is guilty of this crime, the prosecution must prove: "1) The defendant did an act that by its nature would directly and probably result in the application of force to a person; [¶] 2) The defendant did that act willfully; [¶] 3) When defendant acted, [he] was aware of facts that would lead a reasonable person to

6

realize that his act by its nature would directly and probably result in the application of force to someone; and [¶] 4) When the defendant acted, [he] had the present ability to apply force to a person." Section 241, subdivision (b), prohibits assault against a peace officer "engaged in the performance of his or her duties."

Here, the evidence is sufficient to support a finding of assault against a peace officer. Appellant's intentional acts of aggressively opening a door, pushing a 45-pound pit bull mix out of the door, and commanding the dog to "get him, get him" were acts that a reasonable person in appellant's position should have realized would result in the application of force to the person against whom the acts were directed. Although appellant asserts that his dog is not trained to attack anyone and had never attacked anyone in the past, the court was free to discredit the testimony of appellant and his family members regarding the dog's temperament or disposition in light of the fact that the dog immediately heeded to appellant's attack command and ran at Werner, causing Werner to fear for his safety and to utilize his skills as an animal control officer in order to protect himself from the dog. (*People v. Martinez*, *supra*, 158 Cal.App.4th at p. 1331 [credibility determinations are for the trier of fact].) To the extent appellant attempts to distinguish cases holding that particularly vicious dogs may be considered "deadly weapons" within the meaning of section 245 [assault with a deadly weapon], we note that the prosecution in this case was not required to prove that the dog was used as a deadly weapon. Thus, these cases appellant cites—purportedly to show that his dog was not a "deadly weapon"—are inapposite.

### *Sufficiency of the evidence – count three, threats directed at a public officer*

Appellant contends there was insufficient evidence to support a finding as to count three, threats directed at a public officer. We disagree.

Section 71, subdivision (a), provides in part, "Every person who, with intent to cause, attempts to cause, or causes, any officer . . . to do, or refrain from doing, any act in the performance of his duties, by means of a threat, directly communicated to such person, to inflict an unlawful injury upon any person or property, and it reasonably appears to the recipient of the threat that such threat could be carried out, is guilty of a

public offense." Relying on *In re Ernesto H.* (2005) 125 Cal.App.4th 298, 310 for the proposition that section 71 is "designed to prohibit plausible or serious threats and to 'ignore pranks, misunderstandings, and impossibilities,' " appellant argues there was insufficient evidence to satisfy the threat element because his words showed "mere irritation and misunderstanding of Werner's commands and actions" as he tried to figure out what was going on and interpret Werner's commands and actions for his mother. He also asserts the evidence was insufficient to prove he acted with the intent to deter Werner in the performance of his official duties because in "releasing his dog," appellant was "merely telling [Werner] to get the dog . . . himself. . . ."

The record shows, however, that appellant was "highly irritated", frustrated, and repeatedly refused to comply with Werner's requests. At one point, appellant was "[y]elling and stalling" and saying he did not want to give Werner the dog, even after being told why it was necessary to do so. Werner testified—and the court believed his testimony—that appellant then swung open the screen door in an aggressive manner and pushed out an unleashed pit bull mix while commanding, "get him, get him," sending the dog after Werner. The court also discredited appellant's version of the incident that he never released the dog and that he complied with Werner's request by walking the dog over to Werner's van and placing it inside. Viewing the record in the light most favorable to the judgment and considering the surrounding circumstances, (*see In re Ernesto H.*, *supra*, 125 Cal.App.4th at p. 310 [to determine whether a statement is a threat, courts must examine both the words spoken and the circumstances surrounding the communication]), we conclude there was substantial evidence to support the court's finding that appellant's words were used as a threat, and that he sent his dog after Werner with the intent to deter Werner in the performance of his official duties as an animal control officer.[2]

---

[2] Appellant does not contend that the actions he took against Werner constitute a single course of conduct that cannot result in multiple findings against him, i.e., both assault (§ 241, subd. (c), count two) and threat (§ 71, count three). Thus, we need not—and do not—address whether the court erred in sustaining both counts.

## DISPOSITION

The juvenile court's order sustaining the petition as to misdemeanor assault
(§ 240, count one) is reversed.  In all other respects, the dispositional order is affirmed.

_____
McGuiness, P. J.

We concur:


_____
Pollak, J.


_____
Jenkins, J.