Filed 9/16/13  P. v. Fitzpatrick CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARK K. FITZPATRICK,<br><br>    Defendant and Appellant. | 2d Crim. No. B241836<br>(Super. Ct. No. BA356774)<br>(Los Angeles County) |

Mark Fitzpatrick appeals from the judgment following his conviction by jury of sexual penetration under threat by public official (Pen. Code, § 289, subd. (g));[1] sexual battery by restraint (§ 243.4, subd. (a)); sexual penetration by foreign object (§ 289, subd. (a)(1)); and 3 counts of felony false imprisonment (§ 236).  The trial court sentenced him to serve 9 years 4 months in state prison.  Appellant contends:  (1) the court abused its discretion by admitting evidence of uncharged offenses, and (2) trial counsel was ineffective because he failed to conduct vital cross-examination of several prosecution witnesses and misunderstood the law concerning two offenses.  We affirm.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

Appellant, a Los Angeles County Sheriff's Department (LASD) sergeant, committed the charged crimes on May 24, 27, and 29, 2008.  While driving a marked LASD patrol vehicle and wearing his uniform, he stopped each victim as she drove late at night or early in the morning.  The victims did not know each other.

*G.G.*

G.G. was driving her car shortly after 3:00 a.m. on May 24, 2008, when appellant stopped her for speeding.  During the stop, he told her she was speeding and seemed drunk, and that he could take her to jail for driving while intoxicated.  He shined a flashlight on her dress and said she had "really nice" breasts; asked what she would do for him to avoid going to jail; and asked her to show him her breasts.  Appellant grabbed one of G.G.'s breasts when she exposed them.

Appellant told G.G. he would escort her home to be sure she was safe.  She drove a few blocks and parked in her driveway.  G.G. thanked him for escorting her.  Appellant responded, "No, No, No," and asked what she would do for him since he had not put her in jail.  He became a "little scarier," and "just wouldn't let [her] go in."  Appellant asked if G.G. was wearing a thong, and said he wanted to see if she was "clean shaven."  She quickly lowered her leggings and underwear.  She was replacing them when appellant directed her to lower them again.  She complied. Appellant put his finger in her vagina.  G.G. managed to get away from him and run inside her house as a truck entered her street.

During the stop, appellant asked G.G. for her phone number.  She gave it to him.  Her phone rang when she went inside, but she did not answer.  It was appellant, and he left a voicemail message.  He continued to call for several days and left messages saying he wanted to see her.  She feared him and did not return his calls.

*Valerie A.*

On May 27, 2008, just before 11:30 p.m., appellant stopped 19-year-old Valerie A. as she was driving with her friend, Kenya, in the car.  Appellant obtained her

2

driver's license, and asked where they were going. Valerie said they were going to Louis Burgers. He took her license to his vehicle.

Appellant returned to Valerie's car and asked her to step outside. She complied. Valerie and appellant walked to the passenger side of the patrol vehicle. He aimed his flashlight back and forth across her breasts and waist, and asked if she "had anything on [her]." Valerie was wearing a tank top that fit too tightly to conceal anything. She pulled her tank top out, a couple of inches from her breasts, pulled her bra out a bit, and unbuckled her belt. Appellant told Valerie she was pretty, and escorted her back to her car. She got in her car and appellant told her to drive safely. She drove away, and passed Louis Burgers. Appellant followed and asked why she did not stop there. She said she was too nervous to eat after the traffic stop.

Valerie estimated the traffic stop lasted for 20 or 25 minutes. Because appellant was an officer, she did not feel free to leave while he searched her. He did not pat her down or search her car. He said he stopped her for speeding. She did not think she had been speeding. Appellant did not give her a citation.

*Rosa B.*

On May 29, 2008, at approximately 4:30 a.m., Rosa B. was driving in Compton when appellant stopped her car. He requested her driver's license, and asked if she had anything. She thought he was referring to drugs.

Appellant told Rosa her license was suspended, and asked her to step outside. They walked to the patrol vehicle, and appellant told her to sit in the front passenger seat. He stood next to her and directed her to unzip her pants and show him her waist. She complied. He asked her to pull her underwear down. Rosa refused and asked him to call for a female officer. She complied with his request to pull her bra out and shake it. He told Rosa she had a really nice body, and said she should be a stripper. Rosa refused when he asked her to "flash" him, and to accompany him to a hotel room at the end of his shift. During the stop, Rosa worried that appellant would impound her car or arrest her. He did not pat her down, handcuff her, or issue a citation.

3

During cross-examination, Rosa admitted her 2008 petty theft conviction. She conceded she had offered appellant her telephone number on May 29th, and that he declined to take it. During the investigation, she told an officer that unzipping her zipper was not "too bad." She filed a suit against the LASD and appellant, and received a $90,000 settlement from the county.

*Uncharged Offenses*

On June 26, 1999, at about 2:00 a.m., appellant and Deputy Sheriff Cory Walker were in uniform, on patrol in a marked LASD vehicle. They stopped 21-year-old Vickie C. who was with her friend, 33-year-old Araceli P. Araceli spoke very little English. The patrol vehicle approached Vickie's car, and directed her to pull over. She complied.

Walker and appellant approached Vickie's car. Walker spoke with Vickie, who said her driver's license was suspended. Walker directed her to get in the rear passenger seat of the patrol vehicle. Walker told Vickie to open her shirt so he could check for drugs. She was not wearing a bra. She opened her shirt, and Walker directed her to shake her breasts. She complied. Walker shined a flashlight on her breasts. He conducted a record check, and confirmed that Vickie's license was suspended. He told her she had an outstanding warrant and released her.

Meanwhile, appellant opened the passenger door of Vickie's vehicle, and told Araceli to raise her blouse. She complied. Appellant touched Araceli's breasts and squeezed one of her nipples. He shined a flashlight on the lower half of Araceli's body and directed her to pull her pants down and open her legs so he could check for drugs. When her legs were about eight inches apart, appellant inserted two fingers in her vagina. Araceli declined appellant's request to accompany him to a location near the car and touch his penis or allow him to press it between her breasts. She also denied his invitation to visit his home so he could photograph her.

Vickie and Araceli went to a local police station that morning to report appellant and Walker. Not long after making that report, Araceli moved away. She had entered the United States unlawfully, and feared appellant would learn she had reported

4

him. At trial, when asked why she allowed appellant to touch her breasts, Araceli testified that he "said he [was] the authority [and he] . . . was accusing [her] of something." She didn't "know what was going to happen" if she refused. She feared "[s]omething worse, maybe by force," might happen.

*Expert Testimony*

LASD Sergeant Kevin Greer testified as an expert concerning LASD rules and procedures. He testified that if an officer stopped a driver without reasonable suspicion or probable cause that a traffic violation or crime had occurred, it would be an unlawful detention. Assuming an officer makes a lawful traffic detention and decides not to arrest anyone, or issue a citation, he should end the detention upon making that decision. Officers cannot conduct pat down searches of a female driver or passenger or ask her to move her clothing to display her chest or waist, without a reasonable suspicion that she may have a weapon on her person. Suspicion that a driver or passenger possesses drugs does not justify a pat down search. An officer needs probable cause to search a driver or passenger for drugs. When male officers need to conduct a pat down search of a female, they use a different procedure for searching the suspect's chest. Specifically, the officer positions his hand in a "blade" position, so that the only part of his body that touches the suspect's chest area is "either the inside of the forearm or the bladed part of the [outside] of the hand by the pinkie."

LASD does not train officers to direct a female to pull her bra away from her breasts and shake them during traffic stops. Directing a female to move her clothing to display her body or undergarments so the officer can look at her breasts constitutes a strip search. An officer cannot conduct a strip search during a traffic stop, without probable cause and permission from the watch commander.

When presented with hypothetical questions based on the facts of this case, Greer opined that the initial detentions for traffic violations would have been legal. He also opined that the ensuing strip searches, the cavity search, and touching a female's breasts did not comply with LASD practice.

5

*Defense Case*

Appellant testified that his detention of G.G. was prolonged due to computer problems he faced while seeking information about her license. He spoke with her while the computer was down. He was attracted to her. They talked about meeting someday at a taco stand. G.G. said they could go to her place in Mexico together. She told him she was wearing a thong. When he asked if she got her tan in Mexico, she pulled her dress aside to show him she had no tan lines. She offered him her phone number and asked him to follow her home. He accepted her number and followed her home.

When appellant was in G.G.'s driveway, he jokingly said, "Thanks for the show," in reference to her having shown him she had no tan lines. She asked if he wanted to "see it again." He said, "If you want to." She quickly lowered her pants, then raised them quickly and said, "Someone is coming," as vehicle headlights came into view. G.G. thanked him, hugged him, and told him to call her. Appellant called her minutes after they parted. He called her several more times during the next few days, and left some voicemail messages. G.G. sometimes called him. Their conversations were cordial.

Appellant stopped Valerie's car for speeding. During the stop, he did not see Valerie's nipples or her underwear, or require her to display them. She pulled the underwire area of her bra "through" her t-shirt at his request, which was consistent with LASD procedures.

Appellant stopped Rosa's vehicle because it had an expired registration tag. He asked her to get in the patrol vehicle, and she sat in its front passenger seat. He asked her to show him her waist area. She lowered her pants a bit. He did not see her underwear. Appellant told Rosa to grab the fastener section of her bra "through" her shirt, and shake her shirt so that any hidden items would fall out. Nothing fell out. He did not see Rosa's breasts or nipples. He declined her offer to give him her phone number. Rosa settled a case against him and the county for $90,000.

6

During the June 26, 1999 stop of Vickie's car, appellant constantly watched Walker to monitor his safety. The front passenger door of Vickie's car stayed closed during the entire stop, which lasted from five to eight minutes. After his shift ended, appellant slept at the station because he had to start his next shift that day. LASD's Internal Criminal Investigation Bureau personnel interviewed him the same day. Lab personnel swabbed his palms and fingers and took scrapings from his fingernails. Those swabs did not contain Araceli's DNA. Appellant was not disciplined as a result of Araceli's complaint.

Adalberto Luper, a former Los Angeles Police Department officer, testified as an expert. In response to a hypothetical question based on appellant's version of the G.G. stop, Luper opined that appellant's conduct complied with acceptable police practices, in large part. He testified that appellant violated acceptable practices by exchanging telephone numbers with G.G., making plans to meet her for tacos, following her home, hugging her, and calling her. When presented with hypothetical questions based on evidence concerning the stops of Rosa and Valerie, Luper opined that appellant's conduct fell within acceptable police practices. During cross-examination, he conceded there was no probable cause to believe that Rosa or Valerie possessed drugs, and that the searches of them were illegal. When presented with a hypothetical question based on appellant's version of the stop of Vickie and Araceli, Luper opined that appellant's conduct was consistent with acceptable police practices.

## DISCUSSION

### *The Court Acted Within its Discretion in Admitting*
### *Evidence of Uncharged Conduct*

Appellant contends the trial court abused its discretion by admitting evidence of the uncharged 1999 offenses. More specifically, he argues the court should have excluded that evidence pursuant to Evidence Code section 352 because its prejudicial impact substantially outweighed its probative value. We disagree.

Uncharged offenses offered to show a defendant's propensity to commit sexual assaults are not made inadmissible by the general rule against propensity evidence.

7

(Evid. Code, § 1108.)  Pursuant to Evidence Code section 352, the trial court has discretion to exclude such evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  We review such rulings for abuse of discretion.  (*People v. Story* (2009) 45 Cal.4th 1282, 1295.)  The court can only be said to have abused its discretion in resolving the issue "when its ruling 'falls outside the bounds of reason.'  [Citation.]"  (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)

Evidence of appellant's 1999 sexual assault of Araceli was highly probative because those assaults strongly resembled his assault of G.G.  In each case, the assault occurred during an early morning traffic stop; he directed the female victim to move her clothing; he fondled her breasts; and he penetrated her vagina with his finger.  (*People v Hernandez* (2011) 200 Cal.App.4th 953, 966 ["uncharged prior offenses that are very similar in nature to the charged crime[s] logically will have more probative value"].)

Moreover, the highly probative value of the challenged evidence was not substantially outweighed by its prejudicial impact.  As contemplated by Evidence Code section 352, "'prejudicial' is not synonymous with 'damaging,' but refers instead to evidence that '"uniquely tends to evoke an emotional bias against defendant"' without regard to its relevance on material issues.  [Citations.]"  (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)  Appellant's uncharged offenses were not more inflammatory than his crimes against G.G.; the evidence that he committed the charged crimes was compelling; and the jury was properly instructed on the limited purpose for which it might consider the evidence of his prior acts.  (CALJIC Nos. 2.50, 2.50.1.)  The trial court did not exceed the bounds of reason in concluding that the probative value of the uncharged offense evidence was not substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or misleading the jury.  The court did not abuse its discretion.

*Ineffective Assistance of Counsel Claim*

Appellant claims he was denied the effective assistance of counsel because trial counsel failed to cross examine several prosecution witnesses, and he did not understand the relevant law concerning the charged crimes. (AOB 15-24.) We disagree.

To show ineffective assistance of counsel, the defendant must establish that (1) counsel's representation fell below an objective standard of reasonableness, and (2) a reasonable probability that, but for counsel's errors, the defendant would have achieved a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694; *People v. Holt* (1997) 15 Cal.4th 619, 703.) If the record on appeal fails to disclose why counsel acted in the manner challenged, we will affirm the judgment unless there simply could be no satisfactory explanation. (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) We presume counsel's conduct fell within the wide range of reasonable professional assistance, and defer to reasonable tactical decisions. (*People v. Frye* (1998) 18 Cal.4th 894, 979, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

In making his claim, appellant argues that trial counsel failed to cross-examine G.G., Valerie, or Araceli, and his cross-examination of Vickie was not sufficient. Trial counsel's decisions regarding cross-examination fall within the range of tactical decisions, and rarely establish the ineffective assistance of counsel. (*People v. McDermott* (2002) 28 Cal.4th 946, 993.) In this case, counsel was not asked to explain the reason for his decisions.[2] There were, however, valid explanations for his decisions, as the trial court observed in denying the new trial motion:

"[F]our independent complaining witnesses according to reports would come to court and testify to similar events; [¶] . . . [T]rial counsel was able to observe the demeanor and manner of each witness's testimony to determine their level of sympathy to the jury[;] [¶] Sexual assaults cases are perhaps one of the most sensitive cases in our courtrooms. When alleged victims are essentially forced to speak about private

---

[2] During closing argument, counsel told the jury he did not cross-examine Gresia who "was crying and upset when she testified" because he did not "see any necessity of prolonging" her "hard time."

details . . . they would rather keep to themselves, counsel walks a fine line. With this backdrop, [trial counsel] had to assess the pros and cons of cross-examination. If he chose to frontally attack a . . . witness, he had to assess what, if any gains he would receive against the potential danger of turning the jurors against his client. Frontally attacking four separate victims when each were to testify similarly was a high hurdle . . . . [¶] Each victim's story tended to corroborate the others. [H]e had to wait for the witnesses to testify gauge [each] witness's level of sympathy on the stand, consider the likely areas of attack, and quickly determine the gains to be obtained from cross-examination. . . . [¶] On the other hand, there were several potential advantages to be gained by not pursuing extensive cross-examination. First, the damaging impact of the sympathy and pain expressed by the complaining witnesses would be kept short, the witnesses would be off the stand faster; second by not frontally attacking the complaining witnesses, knowing that his client was to later take the stand to testify, he could attempt to preserve any possible goodwill from the jurors that they might apply towards his client."

Appellant's repeated emphasis on the importance of effective cross-examination does not establish that trial counsel acted incompetently. Cross-examination can be "'the greatest legal engine ever invented for the discovery of truth.' [Citation.]" (*California v. Green* (1970) 399 U.S. 149, 158, fn. 11.) However, that engine can backfire with answers that are more harmful than helpful. (See *People v. Earp* (1999) 20 Cal.4th 826, 871-872, where the cross examination of an emergency room doctor by defense counsel elicited unfavorable testimony.) "Cross is not a fishing expedition in which you uncover new . . . surprises at the trial."[3] "In cross-examination, as in fishing, nothing is more ungainly than a fisherman pulled into the water by his catch." (Louis Nizer, My Life in Court, (1961) p. 79.)

---

[3] From a speech given by Irving Younger at the ABA Annual Meeting in 1975, the ABA Section of Litigation Monograph Series, No. 1.

The evidence of appellant's guilt was overwhelming.[4] He complains that his counsel failed to adequately represent him in large part by failing to cross-examine the victims. It appears, however, that counsel made a tactical decision that directly attacking these victims held little prospect for success and portended disaster. He chose, rather, to let appellant "clarify" what happened by offering his view of the events that, while offensive, were merely an exercise in bad judgment which he regretted. In the context of the evidence in this case it was a reasonable, if not successful, choice.

Appellant further contends that trial counsel was incompetent because he did not understand the relevant law. He cites the following excerpt from closing argument in asserting that counsel did not understand the elements of false imprisonment: "When a police officer stops you, detains you for speeding, it is not an unlawful detention. It is a lawful detention." Appellant argues to this court that the just-quoted statement "was a grave misstatement of the law governing false imprisonment," because stops can become unlawful for a variety of reasons. Trial counsel appears to have based his argument on appellant's version of the evidence, in response to the prosecution argument that appellant falsely imprisoned the women he stopped by using fraud, menace or deceit. Appellant had testified that he stopped them because they were violating traffic laws, and that the detentions were lawful. In that context, counsel's statement was hardly a "grave misstatement of the law."

Appellant makes a related claim that counsel misunderstood the law concerning sexual battery, which occurs when the victim is "unlawfully restrained." (CALJIC No. 10.37.) He cites trial counsel's argument that the prosecution failed to prove the sexual battery by restraint because there was no proof of the essential element of

---

[4] Appellant's opening brief mentions that there is not substantial evidence to support his convictions. However, he has not properly presented that as a separate issue on appeal. (Cal. Rules of Court, Rule 8.204, subd. (a)(1)(B) [briefs must "[s]tate each point under a separate heading . . . and support each point by argument and . . . by citation of authority"].) Appellant's reply brief does not controvert or reply to respondent's assertion that appellant failed to properly raise the substantial evidence issue. It would be futile to do so, given the overwhelming evidence of his guilt.

unlawful restraint.  Appellant thus contends that trial counsel "basically argued that once in the lawful custody of a police officer, the officer could touch the victim at will as there was no [un]lawful restraint there could be no sexual battery."  The latter contention ignores counsel's alternative argument that there was no sexual battery because the prosecution failed to prove the essential element that the touching was against G.G.'s will.  (CALJIC No. 10.37.)

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P.J.

YEGAN, J.

12

Sam Ohta, Judge

Superior Court County of Los Angeles

_____

Michael Leonard and Richard Leonard, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Mark E. Weber, Deputy Attorney General, for Plaintiff and Respondent.