Filed 8/29/22  P. v. Reveles CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>JOSHUA REVELES,<br><br>    Defendant and Appellant. | A160620<br><br>(San Mateo County<br>Super. Ct. No. 19SF015667A) |

Appellant Joshua Reveles was convicted of three sex offenses committed against a minor and was sentenced to an aggregate term of 10 years in state prison.  On appeal, he claims the trial court erred in admitting evidence of his prior sexual offenses under Evidence Code sections 1108 and 352.  He also asserts that the court used an incorrect sentencing triad with respect to one count and improperly relied on his criminal history to impose the upper term on that count.  In supplemental briefing, he maintains that newly enacted Senate Bill No. 567 (2021-2022 Reg. Sess.) (SB 567) requires his sentence be modified.  We disagree with appellant's contentions and affirm.

1

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Amended Information

In March 2020, an amended information was filed charging appellant with contacting a minor with the intent to commit oral copulation (Pen. Code, §§ 288.3, subd. (a), 287; count 1),[1] contacting a minor with the intent to obtain child pornography (§§ 288.3, subd. (a), 311.11; count 2), attempting to arrange a meeting with a minor for lewd purposes (§§ 288.4, subd. (a)(2), 664; count 3), and annoying or molesting a child (§ 647.6, subd. (a)(1); count 4). The information alleged appellant had suffered six prior convictions between 2013 and 2015 for contacting a minor with the intent to commit a sexual offense (§ 288.3, subd. (a)), and that he had a total of nine prior registrable sex convictions.

### B. The Prosecution's Case

In November 2019, 17-year-old A.Z. was a high school senior who worked at a restaurant in downtown Redwood City. At around 6:00 p.m. on November 3, 2019, she was seated outside near the restaurant waiting for her friend and coworker S.G. to get off work when she was approached by then 30-year-old appellant who was accompanied by a woman named Margarita. Appellant offered to buy A.Z. a drink, which she declined. A short while later, Margarita approached again and asked if she was okay or needed anything. A.Z. said she was fine and that she was waiting for her friend. She chatted with appellant, Margarita and a man named Alan for about 30 minutes. In response to questions from appellant and Alan, A.Z.

---

[1] All undesignated statutory references are to the Penal Code except as otherwise indicated.

2

said she was a 17-year-old high school senior. Appellant said, "nice," and that he was dating Margarita, who by then had left.

A.Z. went with appellant and Alan to sit outside a nearby bar, where the server asked for her identification. She did not order any alcoholic drinks. Although she had a boyfriend, she gave appellant and Alan her phone number at their request. She texted S.G. that she was with "two guys that were really cool."

Late that night, appellant texted A.Z., asking if she got home alright. She was falling asleep and did not answer. Over the next few days, he began calling and asking her to meet him, but she declined. He also texted her with sexual messages, telling her that he wanted to meet her at a hotel, have sex with her, and "eat [her] out." He said he wanted to be friends with benefits, meaning to "be friends and like have sex but just be friends." She told him she was not interested.

Appellant continued to text A.Z., sending photographs of himself, including two "dick pics." She also received texts from appellant's phone number, purportedly sent by Margarita, in which the woman encouraged her to go to a hotel with appellant and have sex with him. Two days later, A.Z. received more texts from appellant saying he wanted to have sex with her at a hotel. He "constantly" texted her "throughout the day nonstop." She would eventually respond by stating, " 'I can't, I'm under age."

Appellant also offered A.Z. a modeling job in Las Vegas to model clothes and do pornography at the same time. He asked her to send him nude photos of herself. She said she was not interested. She also received more texts from Margarita from the same phone number encouraging her to take the modeling job and go to a hotel to have sex with appellant. A.Z. did not respond.

3

On the night of November 23, 2019, A.Z. was working at the restaurant. She and S.G. both got off work at 10 p.m. and went to another downtown restaurant to have a bite to eat. They ran into appellant and Alan, who invited them to sit down and have a drink. A.Z. said yes because she was having a bad day and wanted to relax. She did not warn S.G. that appellant had been sending her inappropriate texts, including photos of a penis.

Appellant poured both A.Z. and S.G. drinks from a soda bottle into shot glasses. The liquid tasted like alcohol. A.Z. drank six shots and S.G. drank three or four. At around 11:00 p.m., S.G. got up and left abruptly when she saw her father nearby because she did not want him to see her drinking alcohol. By then, A.Z. was drunk and dizzy and may have fallen asleep. She remembered Alan holding her up and then appellant lifting her and putting her in a car. When she woke up inside the car, her shirt and bra were off and appellant was on top of her with his hands on her breasts. When she tried to push him off, he said "calm down" and she blacked out again.

When A.Z. did not come home from work that night, her parents went to the downtown area to try to find her. Her father saw a man pick up a woman and carry her over his shoulder. He thought the woman was A.Z. because he had been tracking her cell phone with an application. The tracker indicated that A.Z. was moving closer to their home, so he called A.Z.'s older brother, J.Z., and told him to go outside their residence.

J.Z. went out and saw a car parked in the Whole Foods parking lot, which was directly across the street from their home. He saw appellant carrying a woman. Appellant put the woman on the ground and drove away. J.Z. went to the woman and saw that it was A.Z. She was unconscious. Appellant drove around the block and came back to the parking lot. He got

4

out and asked J.Z. if he knew the woman. J.Z. told him that she was his sister. Appellant said he had found her outside of a Chipotle restaurant and decided to bring her home.

A.Z.'s parents drove back to their home and saw J.Z. speaking to a man in the Whole Foods parking lot. Her father parked the car and he and his wife got out and went to their daughter who was lying on the ground, unconscious. Her mother yelled at appellant and asked if he knew how old A.Z. was. He replied that he was just a friend and that he worked at Chipotle and was just taking her home. A.Z.'s mother believed him and they shook hands.

A.Z.'s father and her brother picked A.Z. up to carry her home. She was wearing a gray, loose fitting sweater that did not appear to belong to her. Her father did not talk to the man who was with her, but he seemed like the same man that he had seen earlier carrying the woman. They took A.Z. to their apartment and called first responders.

When A.Z. woke up she was in her home with paramedics treating her. She spent most of the night at the hospital. The next day, she told S.G. what had happened. She also told her parents that she had been drinking with some friends that worked at Chipotle. She did not tell her parents about appellant's texts or photos.

A.Z. later received more texts from appellant's phone from Margarita, telling her she had wanted what appellant did to her and it was not a bad thing that happened. Margarita said that she had arrived after A.Z. passed out and that appellant had kissed A.Z.'s neck and "boobs" and she had apparently liked it. The texts stopped when A.Z. replied that what appellant did was not consensual—that she was passed out and he took advantage of her.

Over the next couple of days, appellant asked his coworker, 17-year-old C.A., to reach out to A.Z. for him. Appellant knew that A.Z. and C.A. knew each other and attended the same high school. Appellant previously had asked C.A. to contact A.Z. while the two were at school.

After November 23, A.Z. received text messages from appellant asking her to move in with him. She told him she was underage and lived with her parents. He said she should get emancipated and move in with him. At one point, he invited her to go to a hotel to drink with him again. He also sent her more photos of a penis, one of which she received while she was at school. At some point she told him she would call the police if he did not leave her alone.

Around November 30, 2019, appellant walked into A.Z.'s workplace holding the apron she had been wearing on November 23. The apron was rolled up. Inside its pocket was a box containing a necklace that A.Z. had never seen before.

A couple of weeks after November 23, A.Z. told her mother about what had happened because she was scared and did not know what to do. Two days later, her mother helped her contact the police. By then, A.Z. had deleted all the texts from appellant and Margarita because she wanted to forget. But she did have a screenshot of one set of messages. The screenshot was introduced as evidence during the trial.

Appellant was arrested at work on December 18, 2019. Sergeant Mark Alifano interviewed appellant. Appellant denied knowing that A.Z. was 17 years old. A video of the interview was played for the jury. Sergeant Alifano also interviewed A.Z. twice. During the interviews, she did not mention that she had gone to a bar with appellant the first time she met him.

6

## C. Defense Case

Appellant introduced a photograph and rested his case.

## D. Evidence of Appellant's Prior Offenses

Prior to trial, the trial court granted the prosecution's motion pursuant to Evidence Code sections 1101, subdivision (b) and 1108 to introduce evidence of several of appellant's prior sexual offenses involving underage teenage girls.[2] The evidence introduced at trial is described below.

### 1. A.J.

In July 2013, appellant was convicted of several counts of violating section 288.3, subdivision (a). One of the victims, A.J., testified that she was 14 years old when she first met then 23-year-old appellant at her uncle's birthday party in September 2012. Appellant told her that his friend "Danielle" could give her a modeling job. Excited about the modeling opportunity, A.J. gave appellant her cellphone number. Ten minutes later, while she was still at the party, she received a text message from "Danielle" with information about a modeling job. "Danielle" suggested A.J. discuss the opportunity with appellant. A.J. expressed reluctance because appellant was likely "over 21," but "Danielle" assured her it was okay. Later, A.J. received a text message from a different number claiming to belong to appellant. Appellant told A.J. that she "looked pretty" and that they "should hang out."

"Danielle" continued messaging A.J. for weeks and asked multiple times for "pictures with little to no clothing, full body nude, and close-ups" of

---

[2] The parties stipulated that appellant previously had been convicted of several sex-related crimes between 2011 and 2014, including: contacting a minor with the intent to commit a sex crime or other felony involving a minor (§ 288.3, subd. (a)), arranging a meeting with a minor for lewd purposes (§ 288.4, subd. (a)(1), and unlawful sexual intercourse with a minor (§ 261.5, subd. (c)).

A.J.'s "vagina." "Danielle" asked her to "send alot of different poses naked" and insisted she "hang out" with appellant and "have sex with him." A.J. told "Danielle" appellant "creeped [her] out" "[b]ecause of [their] age difference." "Danielle" encouraged A.J. to "go with" appellant and he would take her anywhere and buy her everything she wanted. At some point, A.J. told "Danielle" she believed there was never a real modeling job and that "Danielle" was actually appellant "trying to get at young ass girls." A.J. stopped messaging appellant and contacted the police. By then, she had deleted some of the messages from appellant because she did not want her mother to see them.

**2. S.S**

S.S. testified that she was 14 years old in 2012 when she first met appellant at her best friend's house. Appellant and her friend, who also was 14 years old, were cousins. In November 2012, S.S. and her friend were at their high school's homecoming football game when they ran into appellant. Appellant asked the girls for their phone numbers and said "Danielle"—an agent for a modeling company—would text them with more information about potential modeling opportunities.

Shortly after, S.S. received a text from "Danielle." S.S. expressed interest in a modeling job and "Danielle" asked her to send her nude photos so that she could assess S.S.'s body shape and figure. S.S. declined. "Danielle" had told her that appellant was a "very great guy; that any girl would be lucky to be with him and that [S.S.] should be that girl." Later, "Danielle" sent S.S. a photograph of an erect penis and said it was from appellant. "Danielle" stated appellant was her cousin and that he had asked "Danielle" to send the photograph to S.S.

8

At some point, S.S. received a text from the same number saying, " 'Hey, it's Josh.' " He then told her he was "transfer[ring] the phone number back to Danielle." S.S. found this odd and believed that "it was one person behind that phone number." Later, she received a text from the same number saying, "Hey my names Anthony. I kno its out of knowhere but a girl gave me your number and said you might be interested?" S.S. did not know "Anthony" and asked, "Interested in what[?]" "Anthony" said, "In me. Can I send you a pic?" S.S. said she had to go, and "Anthony" said, "Ok im gana transfer her number back." S.S. then received a text from "Danielle" saying, "Hey its danielle sweety." "Danielle" told S.S. she still wanted to hire her and asked for nude photographs. S.S. responded she was "only 14" and threatened to contact the police if "Danielle" did not leave her alone.

S.S. showed the texts to her mother, C.R. C.R. messaged appellant threatening to contact the police if he texted again. About one and one-half months later, S.S. received a text message from the same number, saying, "Merry Christmas babe … wish I was there with you." "Panick[ed]," S.S. showed her mother. When C.R. texted appellant pretending to be a 13-year-old girl named "Nicole," she was offered a job and asked if she was a "virgin." She was also told she would be really "lucky to have Joshua" and that she "should get with him." C.R. contacted the police. By then, S.S. had deleted many of the earlier messages from appellant because she had been afraid of getting in trouble if her mother discovered them.

### 3. B.S.

In November 2014, B.S. was a 17-year-old high school senior when she first met appellant at the restaurant where she worked. Appellant was sitting in the bar area when he offered her a high-paying modeling job. She told appellant she was 17 years old and he said that was fine. She expressed

9

interest in the opportunity, and appellant gave her a phone number and told her to text his boss "Danielle."

B.S. texted "Danielle" that day and asked about the modeling job. Danielle asked her for nude photos and said the job required that she have sex with appellant. B.S. felt "uncomfortable" and said she was no longer interested in the job. She asked Danielle to stop messaging her, but Danielle insisted she take the job. She also received texts from another number saying it was appellant.

A couple of days later, appellant returned to the restaurant while B.S. was working. She asked appellant to stop texting her but he did not stop. She contacted the police, and at their suggestion, she initiated a pretext conversation with appellant. During that text conversation, she asked appellant to meet her at the restaurant after work and said she would have sex with him. When he arrived, B.S. called the police. He was arrested and interviewed by police officers.

### 4. A.O.

In October 2014, A.O. was 13 years old when she first met appellant. A.O. and her younger cousin were standing outside the theater waiting for friends when appellant approached them and asked if they wanted modeling jobs. Appellant said his name was "Anthony" and asked the girls for their ages. A.O. told appellant she was 13 years old and he said that was fine. A.O. did not own a cell phone so she gave appellant her mother's phone number.

Later, A.O. received a text message from "Anthony." She inquired further about the modeling job and "Anthony" asked her for photos of her "breasts" and "body." He also asked her to meet him at a hotel near her

10

house. A.O. had fallen asleep and did not respond to this last text, which was sent around 1:00 a.m. Instead, her mother C.E. saw the text message first.

C.E. read the texts between "Anthony" and her daughter and found them inappropriate. Pretending to be A.O., C.E. said she was interested and appellant asked to meet right away. She agreed to meet, and "Anthony" sent her the address to a nearby hotel. C.E. left her house and as she approached the location, he told her he would open the door for her. From across the street, she saw "Anthony" open the door to a hotel and step outside. She then walked back home and called the police. At trial, she identified appellant as the person she saw exit the hotel to meet her. However, previously she had been unable to identify him in a photo line-up.

At some point, A.O.'s 15-year-old sister was using their mother's cellphone when she saw a text message addressed to A.O. about a modeling opportunity. She was also interested in modeling, so she responded. When she stated she was 15 years old, she was told an exception could be made if she had sex with the boss. She immediately gave the cellphone to her mother, C.E.

### E. Verdict and Sentencing

On June 25, 2020, the jurors announced a deadlock on count 3. The jury found appellant guilty as charged in counts 1, 2, and 4. The trial court declared a mistrial on count 3, which was dismissed on the prosecutor's motion. The court found the prior conviction allegations true.

On July 24, 2020, the trial court denied probation and sentenced appellant to 10 years in state prison, comprised of (1) the upper term of three years on count 2, plus a five-year prior conviction enhancement, and (2) one-third the midterm, or four months, on count 1, plus 20 months for a prior

11

conviction enhancement.  Sentencing on count 4 was stayed.  This appeal followed.

## II.

## DISCUSSION

### A.    Admission of Evidence of Prior Offenses

#### 1.  The Parties' Contentions

Appellant does not challenge admission of evidence of his prior offenses under Evidence Code, section 1101, subdivision (b).[3]  However, he claims the trial court abused its discretion and committed prejudicial error in admitting evidence of his prior offenses under Evidence Code section 1108.  He first argues that the evidence was not admissible under the later section because violations of sections 288.3 and 288.4 are not designated as "sexual offenses" within the meaning of Evidence Code section 1108, subdivision (d)(1).  He also asserts that the evidence was unduly prejudicial under Evidence Code section 352, and that the admission of the evidence violated his due process rights.

The Attorney General counters that evidence of appellant's prior sexual offenses was properly admitted under Evidence Code section 1108 because the current and prior offenses involved similar proscribed sexual conduct. The Attorney General further asserts that the evidence was not unduly

---

[3] Evidence Code section 1101, subdivision (b) provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

12

prejudicial under Evidence Code section 352, and that there was no due process violation.

## 2. Applicable Law

"Evidence Code section 1101, subdivision (a) sets forth the ' "strongly entrenched" ' rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion." (*People v. Jackson* (2016) 1 Cal.5th 269, 299.) But when a defendant is charged with a sexual offense, Evidence Code section 1108 "carves out an exception" to Evidence Code section 1101's prohibition against propensity evidence. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823.) Evidence Code section 1108, subdivision (a) states that when a "defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (*Ibid.*) Under Evidence Code section 352, a court has "the discretion to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1116 (*Nguyen*).)

A trial court's ruling on the admissibility of evidence under Evidence Code sections 1108 and 352 "is reviewed for abuse of discretion and will ' "not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Nguyen, supra,* 184 Cal.App.4th at p. 1116; accord, *People v. Story* (2009) 45 Cal.4th 1282, 1295 (*Story*).)

### 3. Analysis

#### a. Evidence Code Section 1108

Appellant's first argument requires us to construe the term "sexual offense" under Evidence Code section 1108. "The first principle of statutory interpretation requires that we turn initially to the words of the statute to ascertain the Legislature's intent. '[I]f " 'the statutory language is clear and unambiguous, there is no need for construction and [reviewing] courts should not indulge in it. [Citation.] The plain language of the statute establishes what was intended by the Legislature.' " [Citation.]' " (*People v. Palacios* (2007) 41 Cal.4th 720, 728.)

As the trial court correctly observed, Evidence Code section 1108 defines sexual offenses by the *conduct* committed, not the *conviction* suffered for such conduct. Specifically, Evidence Code section 1108, subdivision (d)(1) defines "sexual offense" as including, "[a]ny *conduct* proscribed by subdivision (b) or (c) of Section 236.1, Section 243.4, 261, 261.5, 262, 264.1, 266c, 269, 286, 287, 288, 288.2, 288.5, or 289, or subdivision (b), (c), or (d) of Section 311.2 or Section 311.3, 311.4, 311.10, 311.11, 314, or 647.6 of, or former Section 288a of, the Penal Code." (Evid. Code § 1108, subd. (d)(1)(A), italics added.) As is apparent, while sections 288.3 and 288.4 are not listed in this subdivision, sections 287 (oral copulation) and 311.11 (child pornography) are included.

In ruling that appellant's prior sexual offenses were admissible, the trial court relied on *Story, supra.* As the trial court explained, in *Story* "review was granted to decide whether a defendant tried for first-degree felony murder with rape, the underlying felony is accused of a sexual offense under the definition in section 1108, and the Court said 'Because a murder during the course of a rape involves conduct or at least an attempt to engage

14

in conduct prescribed by Penal Code section 261, we conclude that a defendant accused of such a murder is accused of a sexual offense within the meaning of 1108.' " (See *Story, supra,* 45 Cal.4th 1282, 1285.)

The trial court continued: "And I think here the 288.3 and the 288.4 charges, it's just identical logic and reasoning to *Story*; that despite the fact they are not specifically named in 1108, just like 187 isn't, a component of those here, both of them have specific sexual offenses as the target offenses which are included within section 1108. [¶] So moving on in *Story,* the same – a very similar argument was made by the defense in *Story* and relied on by the Court of Appeals, who ended up being reversed, that the –because the accused was accused of murder and that is not found in any of the enumerated Penal Code sections, nor does it include as a necessary element nonconsensual sexual content. That was the reasoning of the Court of Appeal in finding it didn't qualify under 1108 and that was rejected. What the Court – the Supreme Court found there in *Story* was that this type of first-degree murder unquestionably involves conduct prescribed by Penal Code section 261; likewise that 288.3 and 288.4 here involve sexual conduct that is covered within section 1108."

The trial court's reasoning here was correct. We note that the *Story* court found support in *People v. Pierce* (2002) 104 Cal.App.4th 893. (See *Story* at pp. 1293-1294.) In *Pierce*, the appellate court concluded that the crime of assault with intent to commit rape (§ 220) was a sexual offense within the meaning of Evidence Code section 1108, even prior to the amendment that added that crime to the list of included sexual offenses (Evid. Code, § 1108, subd. (d)(1)(B).). The appellate court concluded that the amendment "only clarified the preexisting statute by explicitly including offenses that previously fell within section 1108." (*Id*. at p. 899.) The court

15

reasoned that prior to this amendment, Evidence Code section 1108 already included attempted rape by correlating former subdivision (d)(1)(A) with former subdivision (d)(1)(E) (now (F)), which extends the definition of "sexual offense" to include an attempt or conspiracy to commit the proscribed conduct. The court further reasoned that assault with intent to rape is an aggravated form of attempted rape. (*Id*. at p. 898.)

Similarly, in *People v. Walker* (2006) 139 Cal.App.4th 782 (*Walker*), the appellate court stated: "Although murder, standing alone [citation], is not one of the offenses enumerated in section 1108, subdivision (d)(1), there can be no question certain murder charges would qualify as 'sexual offenses' within the meaning of that provision—for example, a charge of first degree murder alleging special circumstances under Penal Code section 190.2, subdivision (a)(17)(C), (D), (E), (F) and (K) (murder committed while the defendant was engaged in, or accomplice in, commission of, attempted commission of, or immediate flight after committing, or attempting to commit rape, sodomy or other specified sexual crimes). In such a case the defendant is accused of a crime that involves conduct proscribed by section 1108, subdivision (d)(1)(A). [Citation.]." (*Id., Walker, supra,* 139 Cal.App.4th at p. 798.)

We note that although section 288.3 is not enumerated under Evidence Code section 1108, subdivision (d), section 288.3 is not a stand-alone offense. Rather, it is expressly tied to a list of target offenses. Section 288.3, subdivision (a) provides: "Every person who contacts or communicates with a minor, or attempts to contact or communicate with a minor, who knows or reasonably should know that the person is a minor, with intent to commit an offense specified in Section 207, 209, 261, 264.1, 273a, 286, 287, 288, 288.2, 289, 311.1, 311.2, 311.4 or 311.11, or former Section 288a, involving the minor shall be punished by imprisonment in the state prison for the term

16

prescribed for an attempt to commit the intended offense." Appellant's prior offenses, as well as his current crimes of contacting a minor with the intent to commit oral copulation (section 287) and contacting a minor with the intent to obtain child pornography (section 311.11), fall squarely within Evidence Code section 1108's definition of "sexual offense" because the target crimes are specifically enumerated under that statute. (Evid. Code, § 1108, subd. (d)(1)(A).)[4]

It also makes sense that the Legislature would not specifically enumerate section 288.3. As the prosecutor noted below: "The argument that was made about the 1108 motion yesterday that because 288.3 isn't enumerated it should have been excluded. Well, the problem would have been if they had included 288.3 it could have back-doored in other target offenses not related, such as 207 and 209 of the Penal Code, which are both options for target offenses under 288.3."

In sum, we concur with the trial court that, under the reason of *Story* and the cases cited therein, appellant's section 288.3 offenses (counts 1 and 2) fall within section 1108.

### b.     Evidence Code Section 352

Appellant further contends that the trial court erred in admitting evidence of his prior sexual conduct because the prejudice stemming from admission of the evidence substantially outweighed its minimal probative value under Evidence Code section 352.

Evidence Code section 352 vests trial courts with broad discretion to weigh the prejudicial effect of proffered evidence against its probative value.

---

[4] Appellant acknowledges that his conviction under section 647.6, subdivision (a)(1) (count 4) for annoying or molesting a child is a listed sexual offense under section 1108.

(*People v. Williams* (1997) 16 Cal.4th 153, 194.) The trial court has discretion to exclude relevant evidence only "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

When weighing the prejudice of Evidence Code section 1108 evidence against its probative value under Evidence Code section 352, the primary factors to be considered include: "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*Nguyen, supra,* 184 Cal.App.4th at p. 1117.) The trial court balances the probative value established by the first factor against prejudice as measured by the second through fifth factors. (*Ibid*.) We will not disturb the trial court's ruling under section 352 " 'except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.] ' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

Appellant asserts the evidence of his prior offenses was cumulative, had minimal probative value, and was substantially outweighed by its prejudicial effect. Specifically, he argues that evidence of his prior offenses

was not necessary to prove that he knew A.Z. was only 17. He also complains that the evidence of the prior offenses was extensive, and contends that some of the evidence was more inflammatory than the charged offenses because the complaining witnesses were younger, with two being 14 and one being 13. He does, however, essentially concede that the trial court had discretion to admit the evidence pertaining to the offense committed against 17-year-old B.S. because that was the most similar prior offense.

We disagree that the challenged evidence was unnecessary to the prosecution's task in this case. While appellant asserts on appeal that there was no dispute he knew A.Z. was underage, at trial he did assert the defense of mistake of age. Moreover, the prosecutor was required to prove each and every element of the charged offenses. As the Attorney General notes, in both the prior and current offenses, appellant sent sex-related communications to a female who made clear that she was underage, while assuring his victims that it was permissible for them to communicate with him. His communications in the prior incidents were strikingly similar to his communications in the present offenses. For example, in the prior offenses he also posed as a female, offered the female minors modeling jobs, and stated the jobs required they send him nude photographs and have sex with him. The prior offense evidence was clearly relevant to establishing the elements of the present offenses.

And while the prior offense evidence was extensive, it was not overly cumulative. The prior victim witnesses testified to different offenses and their testimony did not overlap. Other witnesses, such as the mother of one of the victims, substantiated the victims' testimony without excessive repetition. Moreover, the detailed testimony was relevant to demonstrating appellant's modus operandi and to establishing his criminal intent. As the

19

Supreme Court has often explained, "the recurrence of a similar result tends to negate an innocent mental state and tends to establish the presence of the normal criminal intent. [Citations.]" (*People v. Jones* (2011) 51 Cal.4th 346, 371.)

Finally, we disagree with appellant's claim that the prior offenses were more inflammatory than the current offenses. While the other victims were younger than A.Z., appellant supplied A.Z. with alcohol until she became unconscious and thereafter groped her. None of the prior victims testified that they were inappropriately touched by appellant or that he had given them alcohol. And, as the Attorney General observes, the age gap between A.Z. and appellant was greater than in the prior offenses. In sum, we conclude the trial court's evidentiary rulings did not constitute an abuse of discretion.

### c. Due Process

Because we find no abuse of discretion under Evidence Code section 352, we also reject appellant's contention that the admission of the prior sexual offenses violated his rights to a fair trial and due process.[5] (See *People v. Falsetta* (1999) 21 Cal.4th 903, 917 ["In summary, we think the trial court's discretion to exclude propensity evidence under [Evidence Code] section 352 saves [Evidence Code] section 1108 from defendant's due process challenge"].)

---

[5] We also note that the jury was instructed with CALCRIM Nos. 303, 375, and 1191A on the permissible use of evidence of the prior acts, which cautioned the jurors that if they found by a preponderance of the evidence that appellant committed a prior sexual offense, that was not sufficient by itself to prove beyond a reasonable doubt that he had committed the charged offenses, and that the prosecutor still had to prove each element of each charge beyond a reasonable doubt. We presume that limiting instructions are followed by the jury. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.

Because we find no error, we need not address the parties' contentions as to whether any error was prejudicial.

**B.** **Sentencing on Count 2**

Appellant asserts that the trial court used an incorrect sentencing triad with respect to count 2, and improperly relied on his criminal history to impose an upper term on that count.

**1. Additional Background**

As noted above, appellant was convicted in count 2 of contacting a minor with the intent to obtain child pornography (§§ 288.3, subd. (a), 311.11, subd. (b).) The parties agreed in their sentencing briefs that the correct sentencing triad for count 2 was one, two, or three years. The trial court imposed the aggravated base term of three years plus five years on the section 288.3, subdivision (c) enhancement.[6] Appellant did not object to his sentence.

**2. Applicable Law**

Section 288.3, subdivision (a) provides, in relevant part: "Every person who contacts or communicates with a minor, or attempts to contact or communicate with a minor, who knows or reasonably should know that the person is a minor, with intent to commit an offense specified in Section … 311.11 … shall be punished by imprisonment in the state prison *for the term prescribed for an attempt to commit the intended offense*." (Italics added.)

Section 311.11, subdivision (a) provides, in relevant part: "Every person who knowingly possesses or controls any matter, representation of information, data, or image … the production of which involves the use of a

_____

[6] Section 288.3, subdivision (c) provides: "A person convicted of a violation of subdivision (a) who has previously been convicted of a violation of subdivision (a) shall be punished by an additional and consecutive term of imprisonment in the state prison for five years."

person under 18 years of age … is guilty of a felony and shall be punished by imprisonment in the state prison, or a county jail for up to one year, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both the fine and imprisonment." Section 18 provides, in part: "Except in cases where a different punishment is prescribed by any law of this state, every offense declared to be a felony is punishable by imprisonment for 16 months, or two or three years in the state prison . . . ."

Section 311.11, subdivision (b) provides enhanced punishment for a defendant "who has been previously convicted of [(1)] a violation of this section, [(2)] an offense requiring registration under the Sex Offender Registration Act, or [(3)] an attempt to commit any of the above-mentioned offenses." In such cases, a defendant "shall be punished by imprisonment in the state prison for two, four, or six years." With exception not applicable here, section 664 (b) provides that the punishment for attempt is "one-half the term of imprisonment prescribed upon a conviction of the offense attempted."

### 3. Analysis

The Attorney General argues that appellant forfeited his claim of sentencing error by failing to object below. Even if the Attorney General is correct, we will address appellant's assertions on the merits to avoid any claim of ineffective assistance of counsel.

Appellant maintains that the correct sentencing triad is that which is specified under sections 311.11, subdivision (a) (and 18) because he was not convicted of violating section 311.11 in the prior offenses, rather, he was convicted of violating section 288.3, subdivision (a). We are not persuaded.

As is apparent, section 311.11, subdivision (b) is not limited to persons who have previously been convicted of a violation of section 311.11. The

22

subdivision also applies to individuals who have been convicted of an offense that requires sex offender registration. Here, it is undisputed that appellant had previously committed offenses that required him to register as a sex offender. Accordingly, the trial court used the correct sentencing triad when it sentenced appellant.

### 4. Dual Use of Facts

Appellant contends that the trial court abused its discretion by using his prior convictions to increase his sentencing in multiple ways, in violation of the statutory prohibition on dual use of facts. We disagree.

At sentencing, the trial court acknowledged that its sentencing decisions were based primarily on appellant's prior convictions. The court stated: "My reasons for the upper term on Count 2, pursuant to rules of court 4.420 and 4.421, are the defendant's priors. And I want to note there, this is only to the extent they exceed the priors necessary to impose the five-year enhancements on Counts 1 and 2. I recognize under 4.420(c) that applied enhancements cannot be a reason for imposing the upper term, but this is a unique situation where the defendant has multiple prior convictions and only two are needed to apply the five-year enhancements, one on each count. So to the extent his priors exceed those two, I find them applicable reasons for imposing the upper term."

Appellant does not contest that he had multiple prior convictions. In fact, his record includes 10 prior felony sex offense convictions. While it constitutes an improper dual use to impose a prior prison term enhancement and to impose the upper term based on the same conviction (*People v. McFearson* (2008) 168 Cal.App.4th 388, 390), the rule does not apply when the prior prison term is based on a multi-offense commitment and splitting the offenses can justify each sentencing decision (see *People v. Brandon*

23

(1995) 32 Cal.App.4th 1033, 1054 [no improper dual use in imposing a five-year enhancement under section 667, subdivision (a) and a prior prison term enhancement when both are based on a single imprisonment for two offenses, each of which could justify each enhancement].) Thus, when a single prior prison term is based on a multi-offense commitment, each offense encompassed by that commitment is not thereby prohibited from being used again in sentencing, when a single offense alone could justify the prior prison term enhancement. (*Ibid*.) Here, appellant suffered not one, but two prior prison terms based on a total of 10 prior sex offenses. Any two of those convictions would have been sufficient to support the prior offense enhancements, leaving the other convictions to be used to impose the upper term with no improper dual use. The trial court did not err in selecting the upper term.

## C. Senate Bill No. 567

In supplemental briefing, appellant maintains that newly enacted Senate Bill No. 567 (2021-2022 Reg. Sess.) (SB 567) requires his sentence on count 2 to be lowered to the midterm. We disagree.

From March 30, 2007, to January 1, 2022, California's determinate sentencing law specified that "[w]hen a judgment of imprisonment [wa]s to be imposed and the statute specifie[d] three possible terms, the choice of the appropriate term ... rest[ed] within the sound discretion of the court." (§ 1170, former subd. (b).)

Effective January 1, 2022, Senate Bill 567 amended section 1170, subdivision (b). (Stats. 2021, ch. 731, § 1.3.) Section 1170, subdivision (b)(2) now provides, "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the

24

facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) As an exception to the general rule, a trial court is permitted to rely upon a certified record of conviction to determine prior criminality for purposes of sentencing without submitting the prior conviction to a jury. (§ 1170, subd. (b)(3).)

As a threshold matter, the parties agree, as do we, Senate Bill 567 is retroactive to cases not yet final on appeal pursuant to *In re Estrada* (1965) 63 Cal.2d 740 (see *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038-1039 [remanding for resentencing under another ameliorative amendment to section 1170 by Senate Bill 567]) and appellant's sentence is not yet final on appeal.

Appellant asserts that the trial court's imposition of the upper term was improper because it was not based on prior convictions proven with a certified record of conviction. Not so. The record shows that the trial court was provided with a certified record of appellant's prior convictions that was submitted by the California Department of Corrections and Rehabilitation. As our Supreme Court has explained, " '[o]fficial government records clearly describing a prior conviction presumptively establish that the conviction in fact occurred . . . . Some evidence must rebut this presumption before the authenticity, accuracy, or sufficiency of the prior conviction records can be called into question.' " (*People v. Delgado* (2008) 43 Cal.4th 1059, 1066; see *People v. Yim* (2007) 152 Cal.App.4th 366, 371, [court records pertaining to a prior conviction were sufficient to "demonstrate, as a matter of law, that [the defendant] committed new offenses while on parole," and "[n]o trial court or jury could rationally find otherwise."].) Appellant does not suggest how he could have possibly contested the fact of his prior convictions and prison

terms.  Moreover, it is clear that the trial court's decision to impose the upper term on Count 2 was primarily based on appellant's criminal history, and not on other factors.  In sum, the court's sentencing decisions fully comported with the new law.

## III.
## DISPOSITION

The judgment is affirmed.

WISS, J.*

WE CONCUR:


MARGULIES, ACTING P.J.


BANKE, J.


A160620


---

* Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.